650 A.2d 252

**Elizabeth M. WARREN**

v.

**Albert Downes WARREN, III, a minor, etc. et al.**

**No. 4, Sept. Term, 1994.**

Court of Appeals of Maryland.

Dec. 8, 1994.

Patricia McHugh Lambert (Smith, Somerville & Case, all on brief), Baltimore, for appellant.

John H. West, III (Manfred W. Leckszas, Ober, Kaler, Grimes & Shriver, all on brief), Baltimore, Jeffrey E. Thompson (Thompson & Thompson, all on brief), Centreville, for appellee.

Thomas V. Monahan, Jr., Susan T. Preston (Goodell, Devries, Leech & Gray, all on brief), Baltimore, Gary I. Strausberg, Randal D. Getz (Janet & Strausberg, all on brief), Baltimore, Paul D. Bekman, Carol J. Glover (Israelson, Salsbury, Clements & Bekman, all on brief), Baltimore, for amicus curiae.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

In this case we are called upon to reexamine the status of the doctrine of parent-child tort immunity in Maryland in light of the large number of states recently abrogating it either altogether or in cases involving motor vehicle torts. This question is presented in the context of whether we should extend parent-child immunity to protect a stepparent from a personal injury claim filed by a stepchild injured in an automobile accident caused by the negligence of the stepparent. For the reasons set forth below, we reaffirm the viability of parent-child tort immunity but refuse both its extension to stepparents and its partial abrogation for motor vehicle torts.

## I

Albert Downes Warren, III (Albert) was born to Christina Warren and Albert Downes Warren, Jr., on June 4, 1984. The Warrens divorced on January 3, 1986, and were granted joint custody of Albert. Albert was to reside permanently with Christina, while Mr. Warren would have liberal visitation rights. Mr. Warren married Elizabeth McNeill (Elizabeth) on January 18, 1991.

Albert was injured in an automobile accident on March 8, 1991, when Elizabeth was driving him home from a shopping trip and negligently allowed the vehicle she operated to cross the center line of the highway, striking a tree and a house on the opposite side of the road. As a result of the accident, Albert suffered numerous injuries, including irreversible brain damage and partial paralysis.

Elizabeth testified at a deposition that she neither considered Albert her child nor intended to perform any parental duties or to incur any parental obligations with regard to him. She participated in Albert's upbringing only minimally during his visits with Mr. Warren. All decisions as to Albert's financial support, education, upbringing, discipline, medical care, and social activities were made exclusively by Albert's biological parents.

When Albert's mother and father filed suit on behalf of Albert against Elizabeth in the Circuit Court for Queen Anne's County, seeking money damages for the injuries Albert suffered in the accident, Elizabeth asserted parental immunity as an affirmative defense. The parties stipulated that Elizabeth's negligence caused Albert's injuries and that the present value of the damages sustained by Albert was $1,750,000. The only issue before the trial court, therefore, was whether Elizabeth was entitled to parent-child immunity. Judge John W. Sause, Jr., concluded that immunity did not protect Elizabeth and entered judgment for Albert in the stipulated amount. Elizabeth noted a timely appeal to the Court of Special Appeals, and we issued a writ of certiorari prior to consideration of the case by the intermediate appellate court.

Three issues are presented for our review: (1) whether Maryland should follow the growing number of jurisdictions that have completely abrogated parent-child tort immunity; (2) whether the immunity should be partially abrogated in cases involving motor vehicle torts; and (3) if the doctrine is not abrogated, whether it should be extended to protect stepparents as well as biological parents. We answer all three questions in the negative.

## II

Contending that parent-child tort immunity should be extended to stepparents, Elizabeth relies on decisions from other state courts. She also asserts that the public policy of promoting family harmony which supports the immunity applies equally to stepparents, whose status renders them a part of the child's family. Indeed, she argues, the immunity is necessary to protect the authority of the stepparent in the relationship with his or her spouse's child.

Albert and his parents, of course, take a contrary view. They assert that we should follow the growing number of jurisdictions abrogating parent-child immunity or limiting its application in motor tort cases.[1] Also, they argue that any extension of the immunity to stepparents would violate the public policy on which the immunity is based. Further, they assert that any decision to expand the immunity to include stepparents should be left to the General Assembly. Finally, they contend that even if this court were to expand the

---

**1.** Only eight states, including Maryland, continue to adhere to the doctrine of parent-child immunity without exception for motor torts. *See* La.Rev.Stat.Ann. § 9:571 (West 1991); *Mitchell v. Davis,* 598 So.2d 801 (Ala.1992); *Carpenter v. Bishop,* 290 Ark. 424, 720 S.W.2d 299 (1986); *Terror Mining Co., Inc. v. Roter,* 866 P.2d 929 (Colo.1994); *Mohorn v. Ross,* 205 Ga.App. 443, 422 S.E.2d 290 (1992); *Vaughan v. Vaughan,* 161 Ind.App. 497, 316 N.E.2d 455 (1974); *Pullen v. Novak,* 169 Neb. 211, 99 N.W.2d 16 (1959). The remainder of the states have never adopted the immunity doctrine, have abrogated it completely, have abrogated it in motor tort cases, or have created other limitations, such as applying a reasonable parent standard or granting immunity only when the exercise of parental discretion is involved. *See infra* note 5.

immunity, a stepparent must stand *in loco parentis* to acquire such immunity, and Elizabeth did not achieve that status under the facts of the instant case.

## III

Parent-child tort immunity was first recognized in 1891 by the Supreme Court of Mississippi in *Hewlett v. George,* 68 Miss. 703, 9 So. 885 (1891). In *Schneider v. Schneider,* 160 Md. 18, 152 A. 498 (1930), this Court adopted the doctrine, holding that a mother was barred from recovery of damages against her son for injuries suffered by her in an automobile accident caused by his negligence. The immunity, we noted, not only prohibited a child's claim against his parent, but also prevented a parent from asserting a civil claim against his child. We fashioned a broad reciprocal immunity under which parents and children could not assert *any* claim for civil redress.

We reiterated the policy underlying the immunity recently in *Frye v. Frye* :

"Our primary concern with regard to matters involving the parent-child relationship was the *protection of family integrity and harmony and the protection of parental discretion in the discipline and care of the child.* We have steadfastly recognized the authority of parents and their need to fulfill the functions devolved upon them by that position. *The parental status should be held inviolate so that there be no undue interference with the dependence of the minor unemancipated child on the parents for such judgment and care needed during the child's minority or with the dependence of the law on the parent for fulfillment of the necessary legal and social functions associated with the office of parent* ...

"It is equally clear that this Court has had an abiding belief that the parent-child immunity rule enhances the public policy in that it subserves the repose of families and the best interests of society by preserving the peace and harmony of society and of the families composing society."

305 Md. 542, 551–52, 505 A.2d 826, 831 (1986) (emphasis added).

In *Frye,* a child was injured when his father negligently drove an automobile off the road and struck a culvert. The defendant moved to dismiss, and the trial court granted that motion, applying parent-child immunity. The child, through his mother, appealed that decision, attacking the immunity and contending that it should be completely abrogated.

Mrs. Frye claimed that our abrogation of interspousal immunity in *Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506 (1983), dictated abrogation of parent-child immunity in negligence cases. We disagreed, noting that *Boblitz* rested principally on the changes that had taken place in the relationship between husband and wife in modern society. At common law, "a wife had no legal existence apart from her husband . . . [and] a suit by her against her husband would not only have to include his name but would be tantamount to the husband suing himself." *Frye,* 305 Md. at 553, 505 A.2d at 832.

In contrast, we noted that the relationship between parent and child had not significantly changed:

"The relationship between husband and wife and the relationship between parent and child, although each relates to the family, are separate and distinct. Each has its own peculiar rights and obligations, benefits and responsibilities. The significant changes in the relationship of husband and wife, noted in *Boblitz,* deemed sufficient to render the interspousal immunity rule obsolete, have simply not occurred as to the parent-child relationship.

"The light of *Boblitz* shines but dimly on the parent-child immunity rule. It does not follow from the mere fact of our departure from the interspousal immunity rule that we should similarly depart from the parent-child immunity rule. Facially, the reasons for our departure from interspousal immunity, provide little support for a similar departure from parent-child immunity. '[T]he common law conception of unity of legal identity of husband and wife had no similar

conception of unity of legal identity in the case of parent and minor child.' "

*Frye*, 305 Md. at 557–58, 505 A.2d at 834 (quoting *Waltzinger v. Birsner*, 212 Md. 107, 126, 128 A.2d 617, 627 (1957)).

We first traced the development of parent-child relationships since common law, including legislative determinations of the rights and obligations involved.

"The legislature had made it perfectly clear that it is 'the policy of this State to promote family stability [and] to preserve family unity....' § 4–401. The policy is evidenced not only by the statutes mentioned above [Maryland Code (1984), §§ 5–202 to –205, § 10–203 of the Family Law Article], which in concept follow the rights and duties of parents and minor children at the common law, but by other statutes codified in the Family Law Article dealing with a wide spectrum of domestic affairs under subtitles such as domestic violence, abused children, neglected children, single parents, battered spouses, paternity proceedings and adoption."

*Id.*, 305 Md. at 560, 505 A.2d at 835–36. After considering the "shifting values in [our] changing world," *Id.* at 561, 505 A.2d at 836, we determined that adhering to the stated policy of promoting family stability, harmony, and peace was still in the best interests of society. "It is clear that today's parent-child relationship, as recognized by this Court and the legislature, furnishes no compelling reason to abrogate the rule." *Id.*

We also examined in detail authority from other jurisdictions both in favor of abrogating and maintaining the immunity, as well as those abrogating the doctrine for motor torts. Our State policy of promoting family harmony and the reciprocal rights and duties between parent and child under our statutes, however, dictated that family harmony be protected by continued application of the immunity.

"[L]egislation concerning parent and child served to intensify, rather than eliminate, the distinctive rights and duties between them, particularly by bringing the mother more into the picture. Thus, the action of the legislature tended

to strengthen the rationale of parent-child immunity rather than weaken it to the point of extinction, as was the case with interspousal immunity."

*Id.* at 559, 505 A.2d at 835. We therefore held that the policy justifications previously expressed by this Court continued to support parent-child tort immunity and declined to abrogate the doctrine.

It has been generally accepted that parent-child immunity rests on three policy justifications in addition to preservation of family harmony: preservation of parental discipline and control, prevention of fraud and collusion, and the threat that litigation will deplete family resources, *see, e.g., Orefice v. Albert,* 237 So.2d 142 (Fla.1970); *Skinner v. Whitley,* 281 N.C. 476, 189 S.E.2d 230 (1972). These justifications apply equally in this state and support our position that immunity is still appropriate and furthers public policy.

In the years since *Schneider,* we have deviated from the basic doctrine in only three instances. First, a minor child who has suffered harm from cruel, inhuman, or outrageous conduct at the hands of a parent may bring suit for monetary damages. *Mahnke v. Moore,* 197 Md. 61, 77 A.2d 923 (1951). Second, an emancipated child may sue his parent in tort for claims arising after the child reaches the age of majority. *Waltzinger v. Birsner,* 212 Md. 107, 128 A.2d 617 (1957). Finally, a child may sue the business partner of his parent for negligence committed in the operation of the parent's partnership. *Hatzinicolas v. Protopapas,* 314 Md. 340, 550 A.2d 947 (1988).

Recently, the Supreme Court of Mississippi limited *Hewlett* by abrogating parent-child immunity in motor tort cases, relying on that court's recent abrogation of interspousal immunity. *Glaskox v. Glaskox,* 614 So.2d 906 (Miss.1992). The reasoning of the *Glaskox* court, however, was similar to that which we explicitly rejected in *Frye, supra.*

We most recently addressed the viability of parent-child immunity in *Smith v. Gross,* 319 Md. 138, 571 A.2d 1219 (1990). There we emphasized that it is the biological relation-

ship between parent and child from which "rights, privileges, obligations, and duties arise." *Id.* at 148, 571 A.2d at 1223. It is exactly those rights and duties which mandate that parents be afforded immunity to protect the exercise of discretion when caring for and raising children. "The level of parental guidance necessary to rear responsible, productive members of society simply cannot be attained in a situation where parents must constantly weigh the benefit of helping a child to understand an important lesson against the looming specter of being hauled into court by an opportunistic attorney for the child." *Glaskox,* 614 So.2d at 913 (Lee, J., dissenting).

Family life and values have not significantly changed since we last addressed this issue in 1990, and we believe that it is still in the best interest of both children and parents to retain parent-child immunity. Abrogating the immunity would result only in further discord within the family and would interfere with the exercise of parental discretion in raising and disciplining children. We are not willing to open the door to rebellious children and frustrated parents and allow the courts to become the arbitrator of parent-child disputes and the overseer of parental decisions.

## IV

We are alternatively asked to abrogate parent-child immunity in cases involving motor torts, a question we last considered in *Frye.* In that case, after noting that many jurisdictions abrogating immunity in motor tort cases relied on compulsory liability insurance to do so, we stated that

"[c]ompulsory motor vehicle liability insurance, however, is exclusively a creature of the legislature. It reflects a public policy recognized by the General Assembly and is an integral part of an elaborate scheme constructed by the legislature for the general welfare and protection of the People of this State. The exclusion of motor torts from the parent-child immunity rule would inevitably have some impact on the insurance scheme and the social policy it furthers. We

do not think it fitting that the nature and consequences of this impact be resolved by this Court."

*Frye*, 305 Md. at 567, 505 A.2d at 839. We continue to adhere to this position and decline to create an exception to parent-child immunity in motor tort cases [2]; any such exception must

---

**2.** As of this writing, forty-three jurisdictions permit suits between parents and children for motor torts, either because parent-child tort immunity was never adopted, or it has been partially or totally abrogated. *See* Conn.Gen.Stat. § 52–572c (1993) (motor torts); N.C.Gen.Stat. § 1–539.21 (Supp.1993) (motor torts); *Hebel v. Hebel,* 435 P.2d 8 (Alaska 1967) (motor torts); *Streenz v. Streenz,* 106 Ariz. 86, 471 P.2d 282 (1970) (motor torts); *Gibson v. Gibson,* 3 Cal.3d 914, 479 P.2d 648, 92 Cal.Rptr. 288 (1971) (total abrogation); *Schneider v. Coe,* 405 A.2d 682 (Del.1979) (abrogated except when parental authority/discretion involved); *Rousey v. Rousey,* 528 A.2d 416 (D.C.1987) (never adopted); *Ard v. Ard,* 414 So.2d 1066 (Fla.1982) (motor torts to extent of insurance); *Petersen v. City & County of Honolulu,* 51 Haw. 484, 462 P.2d 1007 (1970), *aff'd,* 53 Haw. 440, 496 P.2d 4 (1972) (never adopted); *Farmers Ins. Group v. Reed,* 109 Idaho 849, 712 P.2d 550 (1985) (motor torts to extent of insurance); *Cates v. Cates,* 156 Ill.2d 76, 189 Ill.Dec. 14, 619 N.E.2d 715 (1993) (motor torts); *Turner v. Turner,* 304 N.W.2d 786 (Iowa 1981) (total abrogation except when parental discretion/authority involved); *Nocktonick v. Nocktonick,* 227 Kan. 758, 611 P.2d 135 (1980) (motor torts); *Rigdon v. Rigdon,* 465 S.W.2d 921 (Ky.1971) (abrogated except when parental authority/discretion involved); *Black v. Solmitz,* 409 A.2d 634 (Me.1979) (motor torts); *Sorensen v. Sorensen,* 369 Mass. 350, 339 N.E.2d 907 (1975) (seminal case on motor torts); *Wright v. Wright,* 134 Mich.App. 800, 351 N.W.2d 868 (1984) (abrogated except when parental authority/discretion involved); *Anderson v. Stream,* 295 N.W.2d 595 (Minn.1980) (reasonable parent standard); *Glaskox v. Glaskox,* 614 So.2d 906 (Miss.1992) (motor torts); *Hartman v. Hartman,* 821 S.W.2d 852 (Mo.1991) (reasonable parent standard); *Transamerica Ins. Co. v. Royle,* 202 Mont. 173, 656 P.2d 820 (1983) (motor torts); *Rupert v. Stienne,* 90 Nev. 397, 528 P.2d 1013 (1974) (never adopted); *Briere v. Briere,* 107 N.H. 432, 224 A.2d 588 (1966) (motor torts); *France v. A.P.A. Transp. Corp.,* 56 N.J. 500, 267 A.2d 490 (1970) (motor torts); *Guess v. Gulf Ins. Co.,* 96 N.M. 27, 627 P.2d 869 (1981) (motor torts); *Gelbman v. Gelbman,* 23 N.Y.2d 434, 245 N.E.2d 192, 297 N.Y.S.2d 529 (1969) (total abrogation); *Nuelle v. Wells,* 154 N.W.2d 364 (N.D.1967) (motor torts); *Kirchner v. Crystal,* 15 Ohio St.3d 326, 474 N.E.2d 275 (1984) (total abrogation); *Unah v. Martin,* 676 P.2d 1366 (Okla.1984) (motor torts); *Winn v. Gilroy,* 296 Or. 718, 681 P.2d 776 (1984) (motor torts); *Falco v. Pados,* 444 Pa. 372, 282 A.2d 351 (1971) (total abrogation); *Silva v. Silva,* 446 A.2d 1013 (R.I.1982) (motor torts); *Elam v. Elam,* 275 S.C. 132, 268 S.E.2d 109 (1980) (total abrogation); *Broadwell v. Holmes,* 871 S.W.2d 471 (Tenn. 1994) (abrogated except when parental discretion/authority involved); *Jilani v. Jilani,* 767 S.W.2d 671 (Tex.1988) (motor torts); *Elkington v.*

be created by the General Assembly after an examination of appropriate policy considerations in light of the current statutory scheme.

## V

■ We also decline to extend parent-child immunity to protect stepparents, regardless of whether they stand *in loco parentis* to the injured child. Although several other jurisdictions have extended immunity when a stepparent stands *in loco parentis*, none has granted blanket immunity to stepparents simply by virtue of their marriage to a biological parent.[3] *See London Guar. & Accident Co. v. Smith*, 242 Minn. 211, 64 N.W.2d 781 (1954); *Unah v. Martin*, 676 P.2d 1366 (Okla. 1984); *Gunn v. Rollings*, 250 S.C. 302, 157 S.E.2d 590 (1967); *Lyles v. Jackson*, 216 Va. 797, 223 S.E.2d 873 (1976). Other jurisdictions have taken the approach that we adopt today, allowing suits between children and stepparents, reasoning that *in loco parentis* status cannot be determinative of the issue. *See Xaphes v. Mossey*, 224 F.Supp. 578 (D.Vt.1963); *Burdick v. Nawrocki*, 21 Conn.Supp. 272, 154 A.2d 242 (1959); *Rayburn v. Moore*, 241 So.2d 675 (Miss.1970).

When examining the role of a stepparent in today's family, we must focus not only on the fact that stepparenting is more common now than when we first adopted parent-child immunity, but we must also recognize the many duties imposed by the biological relationship between natural parents and children.

---

*Foust*, 618 P.2d 37 (Utah 1980) (never adopted); *Wood v. Wood*, 135 Vt. 119, 370 A.2d 191 (1977) (never adopted); *Smith v. Kauffman, Adm'r*, 212 Va. 181, 183 S.E.2d 190 (1971) (motor torts); *Merrick v. Sutterlin*, 93 Wash.2d 411, 610 P.2d 891 (1980) (motor torts); *Lee v. Comer*, 159 W.Va. 585, 224 S.E.2d 721 (1976) (motor torts); *Goller v. White*, 20 Wis.2d 402, 122 N.W.2d 193 (1963) (abrogated except when parental discretion/authority involved); *Dellapenta v. Dellapenta*, 838 P.2d 1153 (Wyo.1992) (motor torts). South Dakota also never adopted the doctrine.

**3.** Not only has no state extended immunity to stepparents without the *in loco parentis* limitation, none that has extended immunity to stepparents retains the immunity for motor torts.

"[T]he duty of parents to provide for the maintenance of their children, is a principle of natural law; an obligation laid on them not only by nature herself, but by their own proper act, in bringing them into the world: ... By begetting them therefore they have entered into a voluntary obligation to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved."

*Knill v. Knill,* 306 Md. 527, 531–32, 510 A.2d 546, 548 (1986) (quoting 1 W. Blackstone, Commentaries on the Laws of England 447 (1854)). No such duties are imposed upon stepparents by law. Stepparents are authorized to take certain action in regard to children as opposed to being *obligated* to act as are natural parents.[4] In addition to being excluded by the General Assembly from its description of those who have responsibility for the support, care, nurture, welfare, and education of a child, Maryland Code (1991), § 5–203 of the Family Law Article, stepparents, unlike natural parents, have no duty of support, *see Brown v. Brown,* 287 Md. 273, 412 A.2d 396 (1980), and need not make restitution for the delinquent acts of a child, *see In Re Ramont K.,* 305 Md. 482, 505 A.2d 507 (1986). Extending parent-child immunity to stepparents would in effect provide the benefit of being a parent without any of the attendant obligations.

Parent-child immunity is required only for natural parents because the obligations between natural parent and child are reciprocal. This basis was recognized by the Supreme Court of Mississippi in *Hewlett* :

"[S]o long as the parent is under obligation to care for, guide and control, and the child is under *reciprocal obligation* to aid and comfort and obey, no such action as this can be maintained."

---

**4.** For example, stepparents are specifically authorized by statute to discipline stepchildren by use of "reasonable corporal punishment, in light of the age and condition of the child." Maryland Code (Supp. 1994), § 4–501(b)(2) of the Family Law Article.

68 Miss. at 711, 9 So. at 887 (emphasis added). Neither side in a stepparent-stepchild relationship is obligated to the other; stepparents are free to leave the family via divorce and incur no further obligations to the child,[5] and the child is free to make his own choices, subject only to limitations set by his biological parents.

In *Burdick, supra,* the Superior Court of Connecticut held that a stepfather was not immune from suit by his stepson for injuries incurred in an automobile accident, reasoning that the stepfather was under no legal obligation to control, guide, or care for the child.[6] The child's natural father was deceased, and those obligations fell solely to the child's natural mother, the stepfather remaining unfettered by legal duties. She alone had the power to emancipate her son before the age of majority, and the son only owed reciprocal legal obligations to his mother.

In the instant case, only Christina and Mr. Warren could emancipate Albert, and only they had an obligation to control, guide, and care for him. As far as Elizabeth was concerned, Albert was equivalent to an emancipated child. We see no basis on which to distinguish a stepchild from an emancipated child.[7] A suit between stepchild and stepparent is essentially one between individuals who have no legal obligations to each other.[8]

---

**5.** Contrast this with the situation of a natural parent who remains obligated to provide support for the child.

**6.** Connecticut has since abrogated parent-child immunity in cases involving motor torts. Conn.Gen.Stat. § 52–572c (1993).

**7.** Emancipated children fall within a long-recognized exception to the parent-child immunity doctrine. *See Waltzinger v. Birsner,* 212 Md. 107, 128 A.2d 617 (1957). The basis for that decision was that a suit between an emancipated child and a parent is in fact one between two adults, neither of whom bears any obligation or privilege to control the other. *Id.* at 126, 128 A.2d at 627. A stepchild and stepparent are in essentially the same type of situation, and we see no reason to distinguish the two.

**8.** It is interesting to note that the Mississippi Supreme Court had occasion to examine the stepparent immunity issue prior to its decision

We are persuaded that the lack of reciprocal legal obligations between stepparent and stepchild mandates that parent-child immunity not be extended to that relationship.

*JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*

RAKER, J., concurs.

RAKER, Judge, concurring.

I disagree with the holding of the Court that parent-child immunity does not apply to stepparents who genuinely stand *in loco parentis* to the child of a spouse of a former marriage. Although I would apply the doctrine of parental immunity to include a stepparent who genuinely stands *in loco parentis,* I would affirm the judgment of the trial court in the instant case, because the trial judge found as a matter of fact that the stepmother, Elizabeth M. Warren, did not attain that status. I therefore join in the judgment of the Court.

This Court was asked to reconsider the long-standing rule of parent-child immunity as recently as 1986, in *Frye v. Frye,* 305 Md. 542, 505 A.2d 826 (1986). Following a comprehensive analysis of the doctrine, a review of the current status of the doctrine in our sister jurisdictions, and a recognition that Maryland is in the small minority of states retaining parental immunity, this Court declined to abrogate parent-child immunity in actions sounding in negligence or to exclude motor torts from such immunity. Observing that this State is out of step with the rest of the nation, this Court nonetheless refused to change the rule, holding that the change, if at all, should come from the General Assembly.

---

in *Glaskox.* In *Rayburn v. Moore,* 241 So.2d 675, 676 (Miss.1970), that court held that parent-child immunity would not be extended to stepparents, stating that the policy reasons expressed in *Hewlett* did not require such an extension. The defendant-stepparent in *Rayburn,* unlike Elizabeth, supported his stepson although not legally obligated to do so. Despite his *in loco parentis* status, the Supreme Court of Mississippi felt that family harmony would best be preserved if the doctrine remained as it had been originally expressed. *Id.*

In *Frye*, we noted our "abiding belief that the parent-child immunity rule enhances the public policy in that it subserves the repose of families and the best interests of society by preserving the peace and harmony of society and of the families composing society." *Frye*, 305 Md. at 552, 505 A.2d at 831. Nothing new has been argued to us since this Court declined to abrogate the doctrine. Moreover, Judge Orth, writing for the Court in *Frye*, invited the legislature to consider the wisdom of the doctrine, because the exclusion of motor torts from the parent-child immunity rule would inevitably have some impact on Maryland's statutory insurance scheme and the social policy it furthers. The General Assembly has taken no steps in this area. Thus, I believe the principle of *stare decisis* and the inaction of the legislature militate against abolition of parent-child immunity today. *See Abramson v. Reiss*, 334 Md. 193, 207–08, 638 A.2d 743, 750 (1994). The majority does not effect such a change, and I concur; were we writing on a clean slate, however, I might find otherwise. *See Harrison v. Montgomery Co. Bd. of Educ.*, 295 Md. 442, 458, 456 A.2d 894, 902 (1983) (defining *stare decisis* as "the policy which entails the reaffirmation of a decisional doctrine of an appellate court, even though if [the issue were] considered for the first time, the Court might reach a different conclusion").

Given the unwavering commitment by this Court to the parent-child tort immunity rule, I find no justification for refusing to apply the rule to a stepparent who genuinely stands *in loco parentis* to the child of a spouse by a former marriage. The majority recognizes that "[i]t has been generally accepted that parent-child immunity rests on three policy justifications in addition to preservation of family harmony: preservation of parental discipline and control, prevention of fraud and collusion, and the threat that litigation will deplete family resources." Majority opinion at 625. These same justifications apply equally to a home presided over by a stepparent as a natural parent. The Supreme Court of California stated the considerations well in *Trudell v. Leatherby*, 212 Cal. 678, 300 P. 7 (1931), *overruled on other grounds by*

*Gibson v. Gibson,* 3 Cal.3d 914, 479 P.2d 648, 92 Cal.Rptr. 288 (1971) (abrogating parent-child immunity generally):

> The same vexatious conditions created in the family circle by litigation between parent and child would result from like litigation instituted by a minor against the stepfather or stepmother when the minor has been taken into, and is a member of, the household of the latter. We can see no good reason why we should apply the rule in one case and deny its application in the other. If the reason for its application in one instance is sound, it must be equally so in the other, as the conditions brought about by the violation of this rule are the same in each instance.

*Trudell,* 300 P. at 9–10.

The majority reasons, "When examining the role of a stepparent in today's family, we must focus not only on the fact that stepparenting is more common now than when we first adopted parent-child immunity, but we must also recognize the many duties imposed by the biological relationship between natural parents and children." Majority opinion at 628. Noting that "obligations between natural parent and child are reciprocal," the majority concludes that an extension of immunity to stepparents would "provide the benefit of being a parent without any of the attendant obligations." *Id.* at 629. That might be true if the mere fact of marriage between a natural parent and a stepparent would give rise to stepparent immunity. If, however, a stepparent can acquire immunity only by undertaking to serve *in loco parentis* to the child, then immunity will depend on the stepparent's decision to shoulder the responsibilities of child rearing; thus, the benefits and burdens of parenthood will be linked. In this age where stepparenting is commonplace, we ought not discourage a stepparent from assuming parental duties, particularly when his or her spouse is the custodial parent.

It makes no sense to distinguish between a natural or adoptive parent, on the one hand, and one standing *in loco parentis* to the child, on the other hand. *Barry v. Schorling,*

2 Ohio App.3d 110, 440 N.E.2d 1216, 1218 (1981). I agree with the view endorsed by the Minnesota Supreme Court in *London Guarantee & Accident Co. v. Smith*, 242 Minn. 211, 64 N.W.2d 781 (1954), which held that the rule which bars an unemancipated child from maintaining a tort action against a parent applies to a stepparent who stands *in loco parentis* to a minor child. The Court said:

> Whatever may be said of the merits of the rule which bars a personal injury action in ordinary negligence by an unemancipated minor against his parent—and it has been criticized effectively by respectable authorities—as long as it stands unchanged there is no justification for refusing to apply the rule to stepparents who genuinely stand *in loco parentis* to the child of a spouse by a former marriage. It does indeed seem contrary to public policy to discourage a stepfather from voluntarily assuming the unselfish, *in loco parentis* position to a child in need of parental care.

64 N.W.2d at 785 (footnotes omitted).

The trial judge found that Elizabeth Warren was not standing *in loco parentis* to the minor child. Whether a stepparent has attained such status is primarily a question of intent to be determined in light of the circumstances peculiar to each case. *Pope v. State*, 284 Md. 309, 321–23, 396 A.2d 1054, 1062–63 (1979). I would not disturb the finding of the trial judge on this issue. I therefore join in the opinion of the Court in affirming the judgment of the Circuit Court for Queen Anne's County.