133 P.3d 948 (2006)
132 Wash.App. 674
Stacey ZELLMER, individually and as co-personal representative of the Estate of Ashley Cay McLellan, and Bruce McLellan, individually and as co-personal representative of the Estate of Ashley Cay McLellan, Appellants,
v.
Joel ZELLMER, Respondent.
No. 55473-5-I.
Court of Appeals of Washington, Division 1.
May 1, 2006.
*949 Eric William Lindell, Lindell Law Offices, Mercer Island, WA, for Appellants.
Harold B. Field, Murray Dunham & Murray, Joseph D. Hampton, Catherine Pruett Betts, Patterson & Mines, Seattle, for Respondent.
ELLINGTON, J.
¶ 1 A small child drowned in a swimming pool while under her stepfather's supervision. The chief question presented here is whether the doctrine of parental immunity protects stepparents as it does legal parents. We hold it does, so long as the stepparent stands in loco parentis to the child.

*950 BACKGROUND

¶ 2 Three-year-old Ashley McLellan lived primarily with her mother and stepfather, Stacey and Joel Zellmer. On December 3, 2003, Ashley was sick, and stayed home from day care. Her mother went to work, and her stepfather Joel stayed home with Ashley. At approximately 5:00 p.m., Joel's eight-year-old son Dakota came home from school. Joel checked on Ashley in her upstairs bedroom and started a movie for her. About 30 or 40 minutes later, Joel found Ashley floating in the swimming pool in the backyard. He performed CPR until paramedics arrived, but Ashley died two days later.
¶ 3 The Zellmers' marriage ended soon after Ashley's death. Stacey Zellmer and Ashley's father, Bruce McLellan, sued Joel Zellmer for wrongful death, alleging negligent supervision, negligent infliction of emotional distress, willful or wanton misconduct, outrage, and breach of contract. The trial court dismissed all claims on summary judgment, ruling as to the negligence claims that Zellmer was entitled to the protection of the parental immunity doctrine.

ANALYSIS
¶ 4 With certain exceptions, parents and guardians are generally immune from liability to their children for injuries caused by negligent supervision.[1] The doctrine of parental immunity originated to "preserv[e] harmony in domestic relations,"[2] and its purpose has been variously described as "`maintaining family tranquility, fear of undermining parental control and authority, an interest in assuring that family property be shared by all rather than appropriated by one family member, fear of collusion and fraud, and a view of the parent-child relationship as analogous to the husband-wife relationship.'"[3]
¶ 5 The Washington Supreme Court has expressly rejected most of these rationales, holding that the doctrine is grounded not on a need to preserve family tranquility or avoid fraud, but solely on the need for discretion in performing parental duties:
Parenthood places a grave responsibility upon the father and mother. It is their duty to rear and discipline the child. In rearing the child, the parents must provide a home and perform tasks around the home and on the premises. In most cases, it is necessary or convenient to provide a car for family transportation. In all the family activities, the parents and children are living and working together in close relationship, with neither the possibility of dealing with each other at arm's length, as one stranger to another, nor the desire to so deal. The duty to discipline the child carries with it the right to chastise and to prescribe a course of conduct designed for the child's development and welfare. This in turn demands that the parents be given a wide sphere of discretion.
In order that these parental duties may adequately be performed, it is necessary that the parents be not subject to the risk of suit at the hands of their children. If such suits were common-place, or even possible, the freedom and willingness of the father and mother to provide for the needs, comforts and pleasures of the family would be seriously impaired. Public policy therefore demands that parents be *951 given immunity from such suits while in the discharge of parental duties.[[4]]
¶ 6 Initially, appellants urge us to follow the trend in other jurisdictions and abolish the parental immunity doctrine. Our Supreme Court has, however, declined to go so far, directing instead that the doctrine be reviewed on a case by case basis.[5] Appellants also point out that the trend has been to narrow the scope of parental immunity. But the doctrine's reach has thus far been limited in Washington only by the types of parental behavior it protects, not by the parties to whom it applies. Washington thus continues to recognize immunity from suit for parents performing parental duties such as supervision. The question, therefore, is whether the doctrine applies to stepparents performing parental duties.
¶ 7 It is difficult to see why a stepparent living with a child and performing parental duties does not require the same wide sphere of discretion as a legal parent. Indeed, the "freedom and willingness" of a stepparent to provide for the child may be more in need of protection, given that a stepparent's obligation to the child derives only from the circumstance of marriage. In one of the earliest cases to address this question, the Minnesota Supreme Court observed as follows:
If a stepfather has voluntarily assumed all the obligations and beneficent attitudes of a natural parent toward an unemancipated minor child, it is difficult to understand why he should be denied any of the immunities from suit accorded for reasons of public policy to a natural parent. The California supreme court in Trudell v. Leatherby, 212 Cal. 678, 683, 300 P. 7, 9, pointed out that:
"The same vexatious conditions created in the family circle by litigation between parent and child, would result from like litigation instituted by a minor against the stepfather or stepmother when the minor has been taken into and is a member of the household of the latter. We can see no good reason why we should apply the rule in one case and deny its application in the other...."
Clearly, the interests of society require peace and discipline in a home presided over by a faithful and devoted stepparent as well as in a natural home.[[6]]
The majority of courts to address this question agree that the policies justifying parental immunity apply equally to stepparents, so long as they stand in loco parentis to the child.[7]
¶ 8 The requirement of a showing of in loco parentis standing reflects the connection between entitlement to immunity and financial obligation toward the child. In most of these jurisdictions, stepparents are not legally bound to support their stepchildren.[8] Reasoning that immunity is a reciprocal benefit arising from a legally enforceable financial responsibility, these courts conclude that stepparents do not earn the benefit of immunity *952 simply by virtue of marriage to a legal parent.[9] These courts therefore look to in loco parentis status as some guarantee of a continuing commitment, an indication that the injured child will not be left without the negligent stepparent's financial resources.
¶ 9 Financial responsibility is a touchstone in Washington immunity cases as well, and was determinative in Stevens v. Murphy,[10] in which the Washington Supreme Court held a divorced, noncustodial parent immune from suit because the children remained entitled to his financial support:
The prior divorce did not totally deprive him of his parental rights. It did not divest him of the right to the love and affection of his children; nor them of the right to his. Nor did the divorce decree take from the children their legitimate claims of support and aid from their father. This is a complete answer to the argument tendered by appellants that the divorce decree extinguished any parental relationship that existed prior thereto.[[11]]
¶ 10 Further, in Washington, the family support statute imposes financial responsibilities upon stepparents.[12] The statute applies to all stepparents whose stepchildren "are part of the family unit, who reside in the family home, or who are in the residential care of one of the adults in this family unit."[13] The statute codifies the common law, and incorporates the in loco parentis inquiry.[14] A financial support obligation thus arises where a stepparent is in loco parentis, which usually occurs when a stepparent is married to a child's primary residential parent.
¶ 11 There may be rare circumstances in which residential arrangements are not determinative, because a stepparent stands in loco parentis to a child only if he or she has the subjective intent to assume the status of parent to the child.[15] This is a highly factual inquiry, and may be neither simple nor predictable. In today's world of blended families and shared parenting, the question could generate litigation of precisely the kind the immunity doctrine seeks to prevent: putting hearsay and finger pointing on the main stage in circumstances where hindsight clouds rather than illuminates.
¶ 12 But we have discovered only one Washington case considering the in loco parentis status of a stepparent whose stepchildren resided in his home. In In re Montell, unusual facts prevailed, in that the children lived with their mother and stepfather only for the duration of the custodial father's incarceration.[16] The court held the stepfather was essentially an accidental and temporary custodial stepparent without the intent necessary for in loco parentis standing, and thus *953 was not liable to the State for the children's support.[17]
¶ 13 In most cases, however, the stepparent who is married to the primary residential parent and lives in the same household with the child is obliged to support the child.[18] These stepparents assume the duties of parents, and have need of the same wide sphere of discretion as legal parents. We hold that stepparents who are obligated to support stepchildren under the family support statute are protected by the immunity doctrine to the same extent as legal parents.[19]
¶ 14 Nonparental Capacity. Appellants contend that even if the doctrine applies to stepparents, a question of fact exists as to whether Zellmer was engaged in a parental activity at the time of Ashley's death. A parent is not immune where injury to the child results from nonparental activity: "[W]hen the parental activity whereby the child was injured has nothing to do with parental control and discipline, a suit involving such activity cannot be said to undermine those sinews of family life."[20] Thus, a father operating a truck and trailer used for the family business was not immune when he drove over his son who was playing in the public street, because "[f]or all practical purposes, the relationship between the two at the time of the accident was not parent and child, but driver and pedestrian."[21] Similarly, a parent who drives while intoxicated "is temporarily abdicating his parental responsibilities," and thus is not entitled to immunity from liabilities that arise from that behavior.[22]
¶ 15 Here, the parties do not dispute the parental nature of Zellmer's duties at the time of Ashley's death. Rather, appellants allege Zellmer temporarily abdicated his parental responsibility when he fell asleep, which they contend is comparable to driving drunk with a child in the car. Appellants' allegation is based upon inadmissible hearsay.[23] But in any case, the analogy is off the mark. Taking a nap while a sick three-year-old child is in bed watching a video is not like driving drunk with a child in the car. The trial court did not err in its implicit conclusion that Zellmer was acting in a parental capacity at the time of Ashley's death.
¶ 16 Willful or Wanton Conduct. Immunity does not extend to injuries inflicted on a child by a parent's willful or wanton misconduct,[24] which occurs if the actor knows, or has reason to know, of circumstances that would inform a reasonable person of the highly dangerous nature of that conduct.[25] Negligence implies inadvertence; willfulness suggests premeditation or formed intention.[26]
¶ 17 Appellants point to the evidence that Ashley was three years old, that Zellmer knew she could not swim, that Zellmer had not seen her for most of the evening, and that he knew from previous experience that unsupervised young children might wander *954 into the pool area and fall in.[27] Appellants also rely upon evidence of Zellmer's bad character, and point out that after the Zellmers' marriage, insurance was purchased on Ashley's life. Appellants contend this evidence creates a question of fact as to whether Zellmer's conduct was willful or wanton.[28]
¶ 18 We disagree. As our cases demonstrate, acting despite awareness of risk is not, by itself, willful or wanton behavior. A parent's act or failure to act must be so shockingly careless that no reasonable person could fail to act differently in the circumstances.[29]
¶ 19 The previous experience involving other children merely illustrates the obvious danger presented by a pool or hot tub. The incidents do not amount to evidence that Zellmer's conduct on this occasion was willful or wanton.
¶ 20 Parents act within the protected area of discretion when they know their child's general whereabouts, and are not negligent simply because they fail to keep their children under constant surveillance.[30] Further, the pool was in a wooded, unlit backyard, and Ashley was in her bedroom upstairs, separated from the pool by interior stairs, several doors, a second flight of steps outdoors, and a patio. If we were to adopt appellants' theory, any parent whose home has a backyard swimming pool would be required to maintain constant visual surveillance of all small children, even when they are sick in bed.
¶ 21 Finally, evidence of bad general character is not evidence of willful or wanton conduct on a particular occasion. Nor does the purchase of an insurance policy, which many parents consider an investment toward college education, constitute evidence that Ashley's death resulted from willful or wanton conduct.
¶ 22 The court did not err in concluding that questions of fact did not prevent summary judgment.
¶ 23 Immunity in Wrongful Death Actions. In the alternative, appellants contend parental immunity should be unavailable where the child has died, because the family unit no longer exists and thus has no need of the doctrine's protection.
¶ 24 Division Three rejected this argument in Chhuth v. George,[31] reversing a trial court ruling that allowed a school district's contribution claim against the deceased child's father for failure to properly supervise and instruct:
The District contends since the child is deceased, there is no longer a need to protect family tranquility, parental control and authority. We are not persuaded.... Since the underlying reasons for granting parental immunity are unaffected by the demise of a family member, the mere fact the cause of action is for wrongful death will not abrogate the parental immunity doctrine.[[32]]
¶ 25 We agree. As pointed out above, family tranquility is no longer a viable basis *955 for the immunity doctrine.[33] Further, immunity does not depend upon the severity of injuries to the child.[34] To rule otherwise would allow precisely the kind of scrutiny of parental decisions that Borst and other cases sought to prevent.
¶ 26 Appellants rely upon Sisler v. Seeberger,[35] in which Division Three permitted children to sue their mother's estate for negligence because the mother's death removed any need to preserve familial tranquility. Again, familial tranquility is not an objective of the immunity doctrine. But if it were, the death of the tortfeasor is different from the death of the injured child. It is true that the Zellmers' marriage failed after Ashley died. But appellants' argument that a stepchild's death leaves no need to protect family tranquility amounts to an assumption that marital dissolution is the inevitable consequence, and we decline to endorse this premise.
¶ 27 Parental immunity precludes actions for wrongful death just as it does actions for nonfatal injuries.[36]

CONCLUSION
¶ 28 The trial court properly ruled that the parental immunity doctrine applies to Joel Zellmer. We therefore affirm the order of dismissal.
WE CONCUR: COX, C.J., and BAKER, J.
NOTES
[1] Baughn v. Honda Motor Co., 105 Wash.2d 118, 119, 712 P.2d 293 (1986); Cox v. Hugo, 52 Wash.2d 815, 820-21, 329 P.2d 467 (1958). A parent is not immune where a failure to supervise amounts to willful or wanton misconduct, Jenkins v. Snohomish County Public Utility District No. 1, 105 Wash.2d 99, 106, 713 P.2d 79 (1986), where the child is injured as a result of a parent's negligent driving, Merrick v. Sutterlin, 93 Wash.2d 411, 416, 610 P.2d 891 (1980), or where the parent is not acting in a parental capacity at the time of injury. Hoffman v. Tracy, 67 Wash.2d 31, 38, 406 P.2d 323 (1965) (mother abdicated parental responsibility by driving while intoxicated); Borst v. Borst, 41 Wash.2d 642, 251 P.2d 149 (1952) (father not acting in parental capacity when driving truck in the course of his business).
[2] Roller v. Roller, 37 Wash. 242, 243, 79 P. 788 (1905) (overruled by Borst to the extent that parents are not immune from injuries due to willful or wanton misconduct).
[3] Carey v. Reeve, 56 Wash.App. 18, 21, 781 P.2d 904 (1989) (quoting Jenkins v. Snohomish County Public Utility Dist. No. 1, 105 Wash.2d 99, 104, 713 P.2d 79 (1986)).
[4] Borst, 41 Wash.2d at 656, 251 P.2d 149 (cited with approval in Merrick, 93 Wash.2d at 413, 610 P.2d 891 ("In an exhaustive opinion, ... this court examined and renounced most of the policy considerations advanced by the cases to justify the doctrine of immunity. We approve of that analysis.")).
[5] See Merrick, 93 Wash.2d at 416, 610 P.2d 891.
[6] London Guarantee & Accident Co. v. Smith, 242 Minn. 211, 215-16, 64 N.W.2d 781 (1954). Minnesota's parental immunity doctrine was overruled by Anderson v. Stream, 295 N.W.2d 595 (Minn.1980).
[7] See Wooden v. Hale, 1967 OK 69, ¶ 8, 426 P.2d 679 (Okla.1967); see also C.M.L. v. Republic Servs., 800 N.E.2d 200, 206 (Ind.App.2003); Lyles v. Jackson, 216 Va. 797, 799, 223 S.E.2d 873 (1976); Mathis v. Ammons, 453 F.Supp. 1033, 1034-35 (E.D.Tenn.1978); Gunn v. Rollings, 250 S.C. 302, 308, 157 S.E.2d 590 (1967); Bricault v. Deveau, 21 Conn.Supp. 486, 486, 157 A.2d 604 (Conn.Super.Ct.1960).
[8] See, e.g., Wooden, 1967 OK 69, ¶ 8, 426 P.2d 679. A minority of states cite the same rationale for denying immunity to all stepparents, even those who stand in loco parentis. See Warren v. Warren, 336 Md. 618, 629-30, 650 A.2d 252 (1994); Burdick v. Nawrocki, 21 Conn.Supp. 272, 274, 154 A.2d 242 (Conn.Super.Ct.1959) (no immunity for stepfather who "presently voluntarily stands in loco parentis, [but] is not under the legal obligation to care for, guide, and control the child."); Rayburn v. Moore, 241 So.2d 675, 676 (Miss.1970) (parental immunity not extended to stepfather who stood in loco parentis, but was under no legal obligation to support stepchild or treat her as his biological children).
[9] See, e.g., Warren v. Warren, 336 Md. 618, 629-30, 650 A.2d 252 (1994) ("stepparents, unlike natural parents, have no duty of support, and need not make restitution for the delinquent acts of a child").
[10] 69 Wash.2d 939, 421 P.2d 668 (1966) (abolishing immunity in cases of negligent driving), overruled on other grounds by Merrick v. Sutterlin, 93 Wash.2d 411, 416, 610 P.2d 891 (1980).
[11] Id. at 947, 421 P.2d 668.
[12] "The expenses of the family and the education of the children, including stepchildren, are chargeable upon the property of both husband and wife, or either of them, and they may be sued jointly or separately. When a petition for dissolution of marriage or a petition for legal separation is filed, the court may, upon motion of the stepparent, terminate the obligation to support the stepchildren. The obligation to support stepchildren shall cease upon the entry of a decree of dissolution, decree of legal separation, or death." RCW 26.16.205.
[13] Harmon v. Dep't of Soc. & Health Servs., 134 Wash.2d 523, 542, 951 P.2d 770 (1998) (stepfather not responsible for financial support of stepchildren not in custody of or residing with his wife; RCW 26.16.205 does not impose child support obligations on noncustodial stepparents);
[14] Van Dyke v. Thompson, 95 Wash.2d 726, 729-30, 630 P.2d 420 (1981) (family support statute applies only to custodial stepparents); In re Marriage of Farrell, 67 Wash.App. 361, 366, 835 P.2d 267 (1992) (custodial stepparent stands in loco parentis and has both statutory and common law duty to support stepchild who resides with stepparent and legal parent); In re Montell, 54 Wash. App. 708, 712, 775 P.2d 976 (1989) (RCW 26.16.205 merely codifies a custodial stepparent's common law child support obligation).
[15] See Montell, 54 Wash.App. at 712, 775 P.2d 976.
[16] Id. at 711, 775 P.2d 976.
[17] Id. at 713, 775 P.2d 976.
[18] See Harmon, 134 Wash.2d at 542, 951 P.2d 770.
[19] We do not address whether immunity will protect stepparents in other circumstances.
[20] Borst, 41 Wash.2d at 651, 251 P.2d 149.
[21] Id. at 658, 251 P.2d 149.
[22] Hoffman v. Tracy, 67 Wash.2d 31, 38, 406 P.2d 323 (1965).
[23] Appellants submitted the affidavit of Shelly Ahlquist, Dakota's mother, relating Dakota's statement to her that Zellmer was asleep when Ashley drowned. The affidavit is inadmissible hearsay. Zellmer objected below, but the trial court simply considered all evidence submitted and remarked that the court would discount improper evidence. Appellants contend Zellmer waived the hearsay issue by failing to cross-appeal. This is incorrect. See State v. McInally, 125 Wash.App. 854, 863, 106 P.3d 794, review denied, 155 Wash.2d 1022, 126 P.3d 1279 (2005).
[24] Jenkins v. Snohomish County Public Utility District No. 1, 105 Wash.2d 99, 106, 713 P.2d 79 (1986).
[25] Livingston v. City of Everett, 50 Wash.App. 655, 660, 751 P.2d 1199 (1988) (citing Jenkins, 105 Wash.2d at 105-06, 713 P.2d 79).
[26] Adkisson v. City of Seattle, 42 Wash.2d 676, 682, 258 P.2d 461 (1953).
[27] Michelle Barnett testified that in December 2002, her four-year-old daughter fell into the pool in Zellmer's backyard and had to be rescued. According to police, another child fell into Zellmer's hot tub. (This latter evidence is hearsay, but may have been considered by the trial court.)
[28] The week before argument of this case, appellants sought to supplement the record with new police information. That request is denied. Any new evidence should be presented to the trial court. See CR 59.
[29] Compare Stevens, 69 Wash.2d at 947, 421 P.2d 668 (father immune despite evidence of his gross negligence in turning left off a highway), and Jenkins, 105 Wash.2d at 106, 713 P.2d 79 (failure to supervise not willful or wanton where parents knew child's general whereabouts and assumed there was adult supervision where child played with a friend), with Livingston, 50 Wash.App. at 660, 751 P.2d 1199 (it is willful or wanton misconduct to leave a four year old child alone in a room with two Doberman Pinschers).
[30] See Jenkins, 105 Wash.2d at 106, 713 P.2d 79; Cox v. Hugo, 52 Wash.2d 815, 820, 329 P.2d 467 (1958) ("Parents are not required to restrain their children within doors at their peril"; refusing to impose liability for allowing children outside the house to play without keeping them "under constant surveillance.").
[31] 43 Wash.App. 640, 719 P.2d 562 (1986).
[32] Id. at 646-47, 719 P.2d 562.
[33] Borst, 41 Wash.2d at 650-51, 251 P.2d 149.
[34] See, e.g., Commerce Bank v. Augsburger, 288 Ill.App.3d 510, 517, 223 Ill.Dec. 872, 680 N.E.2d 822 (1997) ("The subsequent death of the child does not bear upon the freedom the ... parent... needs to deal with the child in his or her lifetime."); Campbell v. Gruttemeyer, 222 Tenn. 133, 142, 146, 432 S.W.2d 894 (1968) ("It is, to say the least, shocking to our concept of justice that an unemancipated child, who has no cause of action against his living parent, may, if the parent die, and contingent upon such event, have a cause of action against his parent's estate or his administrator. [Though none of the policy bases for parental immunity are present] if both parents are dead, ... we are of the opinion that the rule ... should be applied to such a situation and that the rule ... should not be limited to a situation where the parent is living.... [To find otherwise] would be discriminating against children whose parents are living in favor of those whose parents are deceased.").
[35] 23 Wash.App. 612, 614-15, 596 P.2d 1362 (1979).
[36] Appellants present a variation on this argument, contending immunity is inapplicable here because this particular family never enjoyed tranquility, even before Ashley's death. The argument is unavailing for the same reason. So long as a marriage is legally entered, it is not for the courts to weigh the intimacy or quality of any given relationship.