**The STATE of Ohio**

v.

**VOLAND.**

Court of Common Pleas of Ohio,
Clermont County.

No. 98CR005284.

Decided March 10, 1999.

64

*Daniel Breyer,* Clermont County Assistant Prosecuting Attorney, for plaintiff.
*R. Scott Croswell,* for defendant.

ROBERT P. RINGLAND, Judge.

This matter came before the court on a three-count indictment. Count 1 charged defendant Amy M. Voland with involuntary manslaughter in the commission of a misdemeanor under R.C. 2903.04(B); Counts 2 and 3 charged defendant with child endangering under R.C. 2919.22(A). At trial and in open court, defendant waived her right to a jury and proceeded by way of trial to the court. Counsel presented an agreed stipulation of facts and submitted oral argument. The court took the matter under advisement.

On May 15, 1998, the defendant, while under administrative license suspension (hereafter "ALS") growing out of her arrest for driving under the influence of alcohol, drove her vehicle from the western side of Hamilton County to the Cincinnati Sand Volleyball Courts, located at 837 U.S. Route 50, near Milford, Clermont County, Ohio. She arrived at the volleyball courts at approximately 5:00 p.m. She was accompanied on that drive and at the courts by her daughter, Alexandria, age four, and a cousin, Ashley Weaver, age twelve.

The purpose of this trip across town was recreational, not occupational, in violation of her license to drive under the ALS. At some point after her arrival at the Cincinnati Sand Volleyball Courts, Voland was approached by her cousin, Ashley Weaver, who complained that she was hot and bored. Ashley Weaver was watching Voland's daughter, Alexandria. At that time, the defendant gave her twelve-year-old cousin the keys to her car so that Ashley could get in and start the car to permit the air conditioning to work, allowing Ashley and Alexandria to cool off and wait while defendant played volleyball.

The two children got into the car, started the car, turned on the air conditioning, and listened to the radio. They played in the car while the engine was running, in excess of ninety minutes unattended, with the exception of one visit by defendant. During the one visit, defendant did not notice any attempts to move the vehicle.

At approximately 8:10 p.m., with the two girls playing in the automobile and the engine running, the car lurched forward, over a parking block six to eight inches in height, across a short, grassy area of four to six feet, where the auto

struck a fence. The fence, approximately six to eight feet in height, had a four-by-four post nailed vertically to it, apparently to "seam" two sections of the fence together. This fence post cracked and fell to the ground on the inside of the fence, striking Steven Smith in the head, causing injuries that resulted in his death.

One witness, Linda Morgan, had pulled into the parking lot at 6:40 p.m., saw defendant's black car occupied by two children, and noticed the backup lights on. Morgan noticed the car because it was her intention at that point to allow this car to back out; she was going to take this parking spot, which was fairly close to the entrance of the facility. She waited patiently for a few moments, and then she saw what looked like a young woman or a girl turn from the driver seat, look back at her, turn back in front, and then the backup lights went off. Realizing that the vehicle was not backing out, she went to a different parking spot. As she passed back on her way to the entrance, she again noticed the backup lights on in the car. Morgan went inside the facility and watched friends of hers play volleyball for approximately one hour. She left at about 7:50 p.m. In going back to her car, she passed the black car belonging to the defendant and again saw the backup lights on. She noticed at that time that the driver appeared to be about a fourteen-year-old girl. Morgan then got in her car and left.

Another witness, Heather King, indicated that she was inside the fence, sitting at picnic tables, near the victim who was struck and killed. For several minutes prior to the crash, she could hear a car just outside the fence revving up, and eventually heard the car rev its engine more loudly immediately prior to the fence coming apart as the car crashed into it.

A third witness, Lee Ann Carlier, was playing volleyball from 6:00 to 7:00 p.m. When she left at 7:00 p.m., her car was parked right next to defendant's black Cavalier. She got in, observed the black Cavalier on the left, saw what appeared to be a toddler in the passenger seat; all she could tell was that there was a female in the driver seat. She noticed that the toddler was playing with the windows, moving them up and down. She also saw the brake lights on. She could not recall whether the car was running at that time or not.

A fourth witness, Lisa Highfield, arrived at the volleyball courts at approximately 7:40 to 7:45 p.m. and walked inside to the location near where the victim was seated. She was there to watch volleyball. She could hear the loud music outside the fence, coming from the black Cavalier, and she could see the vehicle through a crack in the slats. She could see the vehicle actually moving back and forth on several occasions.

The life squad responded to the scene by 8:18 p.m., and Smith was unresponsive at that time. The victim was transported to an air-care pickup location and taken to University Hospital, where he subsequently died. The cause of death

was massive trauma to the head, resulting in skull fractures and hemorrhagic cerebral contusion and laceration.

The defendant gave statements that night to the police. Her statement indicated that she did in fact give the keys to the twelve year old to run the vehicle for the air conditioning and the radio. She indicated that she did not authorize the vehicle to be moved and that she checked on the children one time during that period, at the conclusion of her first volleyball game. She then returned to the volleyball court to begin the second game; it was sometime during the second game that the crash occurred.

Ashley Weaver, the twelve year old behind the wheel, indicated that the four year old crawled over in the area where she was seated in the driver seat, knocked the gear shift into drive, and then slid down her leg, striking the gas pedal, causing the car to lurch forward, through the ditch and into the fence. While another witness would indicate that he reached in and put the car into park and noticed that the parking brake was not on at that time, no one else could actually testify as to how the car was put in gear.

Defendant is charged in Counts 2 and 3 with child endangering. In Count 2 it is alleged that under R.C. 2919.22(A), defendant was the parent, guardian, or person in loco parentis of Ashley Weaver and created a substantial risk to the health or safety of the child by violating a duty of care or protection. In Count 3, it is alleged that she is the parent of Alexandria Voland, age four, and created a substantial risk to the health or safety of her daughter by violating a duty of care or protection. Both violations stem from defendant's giving the keys to her vehicle to the twelve year old and allowing the car to be operated without supervision or control in the parking lot for over a one-and-one-half-hour period.

█ While this element is not contained in the indictment, the state must prove, under R.C. 2919.22, the mental culpability of recklessness. *State v. Williams* (1984), 21 Ohio App.3d 12, 21 OBR 13, 486 N.E.2d 113; *Cleveland v. McClendon* (Apr. 8, 1993), Cuyahoga App. No. 62045, unreported, 1993 WL 106953 (despite dicta to the contrary in *State v. O'Brien* [1987], 30 Ohio St.3d 122, 30 OBR 436, 508 N.E.2d 144).

Counsel for defendant argues that the act of leaving a twelve-year-old child in a vehicle with its engine running is not creating a substantial risk to health or safety, nor is it reckless.[1]

---

1. "Let me tell you why this is not child endangering, and let me tell you why it's not a substantial risk, because I would submit to you that on a daily basis across the United States, children are permitted to sit in automobiles, unsupervised. The reason that you never see people appearing in court charged with child endangering is because no child is ever hurt. In other words, there are millions and millions of children on a daily basis sitting in cars, none of

"Recklessness" is defined under R.C. 2901.22(C) as follows:

"A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

The General Assembly also in R.C. 2901.01(A)(7) defined "risk":

" 'Risk' means a significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist."

The Ohio Committee on Jury Instructions, consisting of highly respected and intelligent jurists, has conceded in the comment to 4 OJI 409.21 (1997–1) that "[i]nstructions on recklessness and negligence under the criminal code may be the subject of extensive litigation. Any suggestion by the committee is subject to the usual *caveat* that your guess can be as good as that of anybody else." This, of course, provides little assistance or comfort in helping this court determine the element of recklessness. Review of case law defining recklessness as it applies to criminal statutes (R.C. 2917.11[A], disorderly conduct; R.C. 2921.33[A], resisting arrest; R.C. 2903.13[B], assault) also gives little guidance. Unfortunately, courts, with few exceptions, discuss recklessness by essentially parroting the statutory terms. Cases discussing the element of recklessness in aggravated vehicular homicide, for example, indicate that consumption of intoxicants in and of itself may establish the element of recklessness. See *State v. Gates* (1983), 10 Ohio App.3d 265, 10 OBR 379, 462 N.E.2d 425. One court has held that the terms "perverse" and "perversely" are "not words so arcane, so unusual or used so rarely in written or verbal exchanges as to be beyond the comprehension of ordinary citizens" and require no discussion or further definition. *State v. Mahoney* (1986), 34 Ohio App.3d 114, 120, 517 N.E.2d 957, 963.

█ Several cases, however, are illuminative of the issue of recklessness, providing some guidance. The Ohio Supreme Court has determined that some element of scienter (guilty knowledge) is required in a charge of recklessness, since it involves a known risk. See *State v. Young* (1988), 37 Ohio St.3d 249, 253, 525 N.E.2d 1363, 1369, affirmed in part (1990), 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98. Citing *State v. Jacobellis* (1962), 173 Ohio St. 22, 18 O.O.2d 207, 179 N.E.2d 777, reversed on other grounds (1964), 378 U.S. 184, 84 S.Ct. 1676, 12

---

whom [is] ever hurt. Now, what's the significance of that? The significance of that is that, is that that is the mind-set that, that my client had and that anyone would have when they would permit a child to sit in a car. The very fact that we are sitting here genuinely discussing this is an indication that there are no times where people are hurt as a result of this." (Transcript, closing argument, Croswell.)

L.Ed.2d 793, the court in *State v. Young* opined that scienter is not necessarily the same as "mens rea" or guilty purpose, but may be a lesser standard than the "knowingly" standard. *State v. Young*, 37 Ohio St.3d at 253, 525 N.E.2d at 1369.

█ Most illustrative is *State v. Wright* (1986), 31 Ohio App.3d 232, 31 OBR 515, 510 N.E.2d 827, finding that the state of mind in determining the culpability of recklessness still involves subjective determination. In that case, the court held that where a caretaker left a seven-month-old child unattended near a plugged-in iron that was sitting upright on a dresser, the action was reckless, so that the offense of child endangering was committed when the child pulled the cord, causing the iron to fall on the child. Judge McCormac opined that the court can consider the circumstances surrounding the act and determine the state of mind from inferences arising from those circumstances to determine whether criminal recklessness exists.

█ In *State v. Freeman* (1985), 20 Ohio St.3d 55, 20 OBR 355, 485 N.E.2d 1043, the Supreme Court considered the conviction of a county commissioner charged with violating R.C. 2921.44(E) (no public servant shall recklessly do any act expressly forbidden by law with respect to his office). In that case, the facts indicated that the defendant, as a county commissioner, approved county insurance without competitive bidding. The lower court upheld the conviction, even though evidence showed that it had long been a practice to present the insurance contract to the commissioners after the old policies had expired and after the new policies had begun, requiring the commissioners to approve the contract in order to avoid the lapse of county insurance. The court of appeals held that the state had proved the element of recklessness and based its determination on the entry in Bouvier's Law Dictionary defining "recklessness" as "an indifference whether wrong is done or not." The Ohio Supreme Court upheld the lower court's determination that recklessness had been proved even though evidence existed that the commissioner was a responsible official and had to make a tough choice between two alternatives, *i.e.*, whether to let the insurance lapse and take competitive bids or approve the new policy without bids. Therefore, corrupt or evil motive is not necessary to be reckless.

The Committee Comment to House Bill No. 511, the Criminal Code as revised in 1974 in reference to R.C. 2901.22(C), also provides some guidance:

"A person is said to be reckless under the section when, without caring about the consequences, he *obstinately* disregards a known and significant possibility that his conduct is likely to cause a certain result or be of a certain nature, or that certain circumstances are likely to exist. In substance, the definition follows the definition of recklessness found in *Roszman v. Sammett*, 26 Ohio St.2d 94 [55 O.O.2d 165, 269 N.E.2d 420] (1971).

"Basing the definition of knowledge on probability and the definition of recklessness on likelihood is intentional. Something is 'probable' when there is more reason for expectation or belief than not, whereas something is 'likely' when there is merely good reason for expectation or belief." (Emphasis added.)

In analyzing the element of recklessness, this court has reviewed the legislative history of this provision. Originally the drafters of the 1974 Criminal Code (Technical Committee) had proposed the definition of reckless to track the Model Penal Code definition. The original definition from the Technical Committee provided that "a person acts recklessly when he consciously and unjustifiably disregards a substantial risk that his conduct * * * be of a certain nature." See Ohio Legislative Service Commission Proposed Ohio Criminal Code, 2901.22(C), March 1971 (hereinafter "Yellow Book"), at 39; see, also, Note, The Mens Rea Provisions of the Proposed Ohio Criminal Code—The Continuing Uncertainty (1972), 33 Ohio St. L.J. 354, fn. 187; H. Lehman & A. Norris, Some Legislative History and Comments on Ohio's New Criminal Code (1974), 23 Cleve.St.L.Rev. 8, 10. The Technical Committee intended that the risk involved be of such a nature that to disregard it would involve a gross deviation from the standards of conduct that a law-abiding person would observe in the actor's situation. 33 Ohio St.L.J., *supra*, at 382.

The Technical Committee comments state in the Yellow Book, at 41:

"Division (C) is intended to describe recklessness in the sense of rashness or heedless indifference to the consequences. It is not the technical committee's object to require that recklessness must have an element of wantonness or malice although it recognizes that under given circumstances reckless may be wanton or malice."

The Ohio House of Representatives, however, made amendments to the wording. The House added the undefined term "with heedless indifference to the consequences." Apparently, the House incorporated the Committee Comment to the substance of the statute. However, the House took out the words "consciously" as it modified "disregard," which, according to commentators, resulted in the emphasis on the subjective elements of recklessness. 33 Ohio St. L.J. at 383. This amendment, when read with the term "may," implied that only a slight *mens rea* was necessary. "Heedless" implied lack of awareness; the striking of the phrase "consciously and unjustifiably" disregarding a risk also implied that premeditation or assessment of a risk before acting was not required. *Id.*

In summary, the Ohio Criminal Code, as then proposed, created culpability somewhere between the Model Penal Code of recklessness and the Ohio definition of civil tort negligence. As such, the Ohio Criminal Code was criticized because of its subjectivity in failing to provide an objective equal standard and its confusion with the standards of negligence. Ohio St.L.J. at 386–387.

Several months after the Ohio State Law Journal critique was published, the statute was again amended by the Senate. While there is no evidence that the amendments were the result of this article, it appears that the criticized portions of the statute were the ones addressed by the Senate amendments. The Senate amendments proposed the version as it now reads, and after debate and compromise (on other issues involving the Criminal Code) H.B. No. 511 was passed. Rather than the terms "consciously or unjustifiably disregard" as proposed by the Technical Committee or "disregard" as proposed by the House, the final version of H.B. No. 511 added the undefined term "perversely" and substituted "known risk" for "substantial risk." The final bill also added the term "likely" and deleted "may." In doing so, the legislature intended the result of the conduct to be more than just a possibility, yet something less than a probability, as was required under "knowingly" per R.C. 2901.22(B).

Even though "perversely" has been added to the term "disregard," former Director of the Ohio Legal Center Institute James Young has opined that the original Technical Committee's definition of "rash" is appropriate. Young adopted the Technical Committee's example of a speedboat operator going "flat out" in a congested dock area or in a known shoal water to best explain reckless or recklessness. Young, OLCI Comment, Reference Manual for Continuing Legal Education # 87 Criminal Code (1972), at 10–47.

The Committee Comment to H.B. No. 511 also refers to *Roszman v. Sammett* (1971), 26 Ohio St.2d 94, 55 O.O.2d 165, 269 N.E.2d 420, as setting forth the definition of "reckless" in substance. While *Roszman* discusses the civil concepts of "wanton misconduct," which the Technical Committee had declined to equate with criminal recklessness, the opinion does define "perverse" and sheds light on the legislative interpretation of perverse, 26 Ohio St.2d at 97, 55 O.O.2d at 166, 269 N.E.2d at 422–423:

"In order to establish wantonness, the conduct must be supported by evidence that shows a disposition to perversity, such as acts of stubbornness, obstinacy or persistency in opposing that which is right, reasonable, correct or generally accepted as a course to follow in protecting the safety of others.

"Such perversity on the part of the tort-feasor must be found to be under such circumstances and existing conditions that the party doing the act, or failing to act, must be conscious from his knowledge of such surrounding circumstances and existing conditions that his conduct will, in all common probability, result in injury."

As previously indicated, the analysis of recklessness has involved past consideration of substantial risk, *i.e.,* final review of recklessness substituted "known risk" for "substantial risk." The state must prove not only recklessness

but that the reckless culpability was a violation of a duty of care that created a substantial risk to another. "Substantial risk" is defined under R.C. 2901.01(A)(8) as being "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur." Was the omission of defendant reckless and did it create a substantial risk to the safety and health of Ashley Weaver?

It is clear that Ashley was permitted to operate the vehicle, *i.e.*, turning it on and, according to one witness, putting it in gear, more than merely putting the key in the ignition. See *State v. Gill* (1994), 70 Ohio St.3d 150, 637 N.E.2d 897, certiorari denied (1995), 514 U.S. 1023, 115 S.Ct. 1371, 131 L.Ed.2d 227. While a motor vehicle is not inherently dangerous *per se*, *Williamson v. Eclipse Motor Lines, Inc.* (1945), 145 Ohio St. 467, 31 O.O. 156, 62 N.E.2d 339, if operated recklessly or even negligently it becomes so, see *State v. Adkins* (1973), 40 Ohio App.2d 473, 69 O.O.2d 416, 320 N.E.2d 308, and has been likened to a firearm in the wrong hands. *State v. Kavlich* (1986), 33 Ohio App.3d 240, 515 N.E.2d 652.

Here the facts show that defendant did more than leave a twelve year old in a running automobile. She gave that twelve year old sole control of that automobile by handing the keys to the young child. While no permission was given to put the car in gear, nevertheless, this automobile was an automatic shift and very easy to put in gear, as was evidenced on several occasions where the automobile was placed in gear. Here the automobile was not within view of the defendant because it was blocked by a fence, and defendant was busily engaged in playing volleyball. Only after the first game did she bother to check at all on the welfare of the children. There is no evidence that she attempted to monitor, review, or correct attempts by the twelve year old to place the car in gear at any time other than at that visit. . Defendant was oblivious to any actions that occurred in the automobile during this one-and-one-half-hour period.

This court further finds that defendant was not only reckless in giving the keys to the twelve year old with little supervision but also violated her duty of care in failing to observe or monitor the children while in the automobile for most of that one-and-one-half-hour period. Certainly this failure to care placed in jeopardy the safety of the young girl behind the wheel. Human experience indicates that children of this age can easily operate an automatic shift automobile but have very little experience in controlling this powerful and potentially dangerous instrumentality. Luckily the children were unhurt, but nevertheless, such omissions and lack of supervision placed the twelve-year-old child's safety at substantial risk in that there was a strong possibility that out of boredom this car would eventually be put in gear. The lack of eventual injury to the child does not negate the "significant possibility" or risk in child endangering.

■ Most troublesome, however, to this court in this count is the issue concerning the relationship of Ashley Weaver to the defendant. The state has the burden of proving that the defendant was a parent, guardian, custodian, or person in loco parentis. For whatever reason, the state did not include in the indictment or indict defendant for being a person in custody or control of Ashley, nor was there any request to amend the indictment prior to trial. It is undisputed that defendant is the parent of Ashley, nor is there any issue that defendant is the guardian or custodian of Ashley. "Guardian" is defined under R.C. 2111.01(A) as "any person * * * appointed by the probate court to have the care and management of the person, the estate, or both of [a] * * * minor." See, also, 4 OJI 519.22 (1997–1), at 341. The common, ordinary meaning of custodian is "guardian" or "caretaker." See Funk & Wagnalls National Dictionary of Language (1982), at 318. The Committee on Jury Instructions offers the definition of "custodian" as "one entrusted officially with custody." 4 OJI, *supra.* Obviously neither status applies here.

■ The status of in loco parentis requires more than one who might temporarily have some disciplinary control over a child. See *State v. Noggle* (1993), 67 Ohio St.3d 31, 33, 615 N.E.2d 1040, 1042. It applies to one who is relied upon by the child for support or applies to the person "the child goes home to." *Id.* The status of in loco parentis is a relationship that a person assumes toward a child not her own, holding her out to the world as a member of her family toward whom she owes discharge of parental duties. A person standing in loco parentis to a child is one who puts himself in position of a lawful parent assuming obligations incidental to parental relations without going through formalities necessary for legal adoption. *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 680 N.E.2d 161. No evidence exists that the relationship of the babysitter Ashley Weaver to defendant was in any way in loco parentis.

■ Evidence, however, does exist that the defendant had "custody and control" as the term exists in R.C. 2919.22(A). "Custody and control" as used in R.C. 2919.22(A) has been defined as more than a casual relationship but something less than being in loco parentis. *State v. Schoolcraft* (May 29, 1992), Portage App. No. 91–P–2340, unreported, 1992 WL 276661; *State v. Kirk* (Mar. 24, 1994), Franklin App. No. 93AP–726, unreported, 1994 WL 97231; *State v. Smith* (Jan. 25, 1996), Cuyahoga App. No. 68745, unreported, 1996 WL 28583. Therefore, custody and control would be the appropriate status and relationship between Ashley and the defendant. However, as previously noted, the state did not allege this relationship in the indictment, for whatever reason, nor did it ask to amend the indictment; therefore, this court is not free to consider this relationship, as it is not an element before it.

Based upon all of the above, while the state has proved the elements of recklessness and breach of duty, it has failed to prove beyond a reasonable doubt the relationship between defendant and her cousin Ashley Weaver, and, therefore, the court must return a verdict as to Count 2 of not guilty.

However, in turning to Count 3 involving the defendant's daughter, none of these infirmities exists. It is clear that defendant is a parent and that she was charged as such in Count 3. While, of course, having a four year old in the custody of a twelve year old is not *per se* reckless, nevertheless, allowing the twelve-year-old babysitter to operate the motor vehicle in the manner previously discussed is indeed reckless when combined with all the other factors this court discussed in the previous count. For all of the above reasons, this court finds that the state has proved beyond a reasonable doubt that the defendant is guilty of child endangering in Count 3 involving her daughter under R.C. 2919.22(A).

The court finally turns to the first count in this indictment, which is involuntary manslaughter. The state indicted defendant on Count 1 under R.C. 2903.04(B) in that she did cause the death of another as a proximate result of committing or attempting to commit a misdemeanor. The underlying misdemeanors that the state alleges as the basis of the charge are (1) endangering children (R.C. 2919.22[A] as previously discussed), (2) a violation of R.C. 4507.02(C) and (D), driving under and ALS, or (3) a violation of R.C. 4507.02(A)(2), permitting operation of a motor vehicle by an unlicensed driver.

This court has made a finding that defendant violated the child endangering statute, R.C. 2919.22(A). It is undisputed that the defendant also violated R.C. 4507.02(A)(2), (C), and (D). There is no dispute that she permitted an unlicensed driver to operate the vehicle by merely allowing her cousin to insert the key into the ignition and turn on the engine. See *State v. Gill, supra.* It is further undisputed that defendant drove the automobile to Milford, Ohio, while under an ALS pursuant to R.C. 4511.191. Driving while under an ALS is a separate criminal offense. See *State v. Campoy* (Jan. 9, 1997), Cuyahoga App. No. 70536, unreported, 1997 WL 10179; *State v. Pahlau* (Feb. 10, 1997), Stark App. No. 1996CA00177, unreported, 1997 WL 116967. Further, as indicated, it is undisputed that the victim died as a proximate result of a fence post striking him on the head. Finally, it is clear that the culpable mental state requisite for a conviction of involuntary manslaughter is the culpable mental state of the underlying misdemeanor. *Stanley v. Turner* (C.A.6., 1993), 6 F.3d 399. The issue remaining is whether any of these underlying misdemeanors committed by the defendant proximately resulted in the death of the victim.

The state's first theory of criminal liability is that "but for" the defendant's having driven under the ALS in violation of R.C. 4507.02(C) and (D),

the death would not have occurred. To an extent, the state is correct. Obviously, if she were not in the Milford area, this event would not have taken place. This is considered to be the "but for" test or the cause-in-fact test of liability. See Prosser & Keaton, The Law of Torts (5 Ed.1984), Section 41, at 263. However, criminal law in general and R.C. 2903.04 in particular require legal or proximate cause. *Id.* at 272. See, also, J. Focht, Proximate Cause in the Law of Homicide (1938). 12 S.Cal.L.Rev. 19, 20. Commentators argue that criminal proximate cause is different from tort law in that the consequences of guilt are more drastic than civil monetary liability. A closer relationship between the result achieved and that intended or risked should be required. See W. LaFave & A. Scott, Substantive Criminal Law (1986), Section 3.12(c), at 397; see, also, J. Goldsmith, Involuntary Manslaughter: Review and Commentary on Ohio Law (1979), 40 Ohio St.L.J. 569, 585. Simply put, the test is whether the conduct of driving to the volleyball game was so closely connected with the end result of death that it merits legal responsibility. Obviously, other "but for" causes exist, *e.g.,* but for her parking near the fence, the accident would not have occurred; "but for" her owning an automobile with an automatic shift as opposed to manual shift the accident would not have occurred, etc. While all the above are causes, none, including driving under administrative suspension, is arguably the legal proximate cause of the death. If she had never had an ALS when she drove to the volleyball game would the events causing the death still have taken place?

 Driving under suspension per R.C. 4507.02 is a strict liability crime; no culpability is required. *State v. Harr* (1992), 81 Ohio App.3d 244, 610 N.E.2d 1049; *State v. Morrison* (1982), 2 Ohio App.3d 364, 367, 2 OBR 421, 424–425, 442 N.E.2d 114, 119.

Courts have refused to find defendants guilty of involuntary manslaughter without finding a culpable mental state. *State v. Kuhajda* (1993), 67 Ohio St.3d 450, 619 N.E.2d 1016. The legislature, in an apparent response to this decision, amended R.C. 2903.04(B) to include misdemeanors. See 1994 Sub.H.B. No. 236, 145 Ohio Laws, Part III, 5116, 5117. Subsequently, a split of authority exists as to the constitutionality of criminal liability based on an underlying misdemeanor. See *State v. Campbell* (1997), 117 Ohio App.3d 762, 691 N.E.2d 711, and *State v. Weitbrecht* (July 31, 1998), Holmes App. No. 97CA588, unreported, 1998 WL 518306 (holding the Eighth Amendment is violated), certified conflict pending in No. 98–2144; and cf. *State v. Carper* (Mar. 1, 1999), Fayette App. No. CA98–06–009 unreported, 1999 WL 98990, and *State v. Garland* (1996), 116 Ohio App.3d 461, 688 N.E.2d 557, discretionary appeal not allowed (1997), 78 Ohio St.3d 1518, 679 N.E.2d 312, holding no constitutional violation. The Ohio Supreme Court has accepted *Weitbrecht* for review due to this split of authority. 84 Ohio St.3d 1410, 701 N.E.2d 1020. In summary, therefore, not only is the state's theory involving

the underlying charge of an ALS under R.C. 4507.02(C) and (D) not the proximate cause, but arguably it is not an appropriate underlying charge, since it involves strict liability.

The same reasoning applies to the underlying charge of R.C. 4507.02(B), allowing an unlicensed driver to operate a motor vehicle. However, assuming *arguendo* that the Supreme Court holds that a minor misdemeanor can be an underlying charge, the issue of proximate cause remains.

■ On the issue of proximate cause, the state's second and third theories are intertwined. The state argues that allowing the underaged and unlicensed driver to operate the motor vehicle in violation of R.C. 4507.02(B) was a proximate cause of death. Also, the state argues that endangering the defendant's child, pursuant to R.C. 2919.22 as discussed above, also proximately resulted in the death of Smith.

■ In determining proximate cause, it is essential that the end result (the death of another) be foreseeable. See *State v. Chambers* (1977), 53 Ohio App.2d 266, 7 O.O.3d 326, 373 N.E.2d 393; *State v. Ziko* (1991), 71 Ohio App.3d 832, 595 N.E.2d 1019. Ohio has long held that manslaughter requires that the killing be such as would naturally, logically, and proximately result from the commission of some unlawful act as defined by statute. See *Black v. State* (1921), 103 Ohio St. 434, 133 N.E. 795. The actor or perpetrator is held responsible for deaths emanating from all but the most unforeseeable consequences of his initial act. Goldsmith, *supra,* 40 Ohio St.L.J. at 582. An intervening force, if foreseeable, does not negate legal proximate cause. See *State v. Johnson* (1978), 56 Ohio St.2d 35, 10 O.O.3d 78, 381 N.E.2d 637. Foreseeability is likened to where the consequences of conduct are direct, normal, and reasonably inevitable when viewed in the light of ordinary experience. *State v. Losey* (1985), 23 Ohio App.3d 93, 23 OBR 158, 491 N.E.2d 379. In summary, then, the court must answer the question whether it was foreseeable that allowing the twelve year old to operate the motor vehicle in the manner described above would result in the death of another.

Certainly this court could see that it is foreseeable that the twelve-year-old girl could put the car in gear and strike another. It is further foreseeable that the twelve year old could put the car in gear and strike the fence, which could strike another causing death. However, those are not the facts of this case that have been stipulated and that this court is required to follow. Admittedly, evidence exists that the car had been put in gear prior to the accident by the twelve year old; nevertheless, it is admitted and stipulated into evidence that the actual cause of the car's being put into gear is not known and that the only explanation of the actual cause is that the four year old moved over to the driver's side, hit the gear

shift, which put the car in gear, and that the child then fell on the accelerator, forcing the car forward. This court did not have the luxury of observing the witness to determine the credibility of this version of the accident, and so this court has no other choice but to accept the explanation of the accident accordingly. The circumstantial evidence of the twelve year old's actions of putting the car in gear several times prior to this does not rebut beyond a reasonable doubt this stipulated version.

Thus, with the facts as presented to this court, the court must find that the four year old's actions were an unforeseen, intervening act. If no underlying violation had occurred, *i.e.,* if a licensed adult was behind the wheel, this accident still could have occurred in the manner in which it did occur. The car traveled only three to four feet in a matter of seconds. An experienced driver would have difficulty bringing the vehicle to a stop sooner. Consequently, this tragic death was a remote consequence of the acts of child endangering and of allowing an unlicensed driver to operate the motor vehicle. The cause of this unfortunate accident was unforeseeable. This unforeseeable cause is further compounded by the fact that the car struck the fence, which did not itself hit the victim or cause death, but rather the car caused the fence to pop a four-by-four post that held the seams of the fences together; this in turn fell, causing death to Smith. While, admittedly, the state is not required to prove the foreseeability of the precise cause of death, taking the event in its totality, this court cannot find that the accident, as it occurred, was foreseeable. As such, this court must make a determination that defendant is not guilty of involuntary manslaughter as set forth in the indictment in Count 1. Defendant is accordingly to report to the probation department on Count 3 for a presentence report and later sentencing thirty days hence.

*Judgment accordingly.*