McMANUS, Guardian *ad litem,* and others, Plaintiffs and Respondents, v. HINNEY and another, Defendants: IOWA NATIONAL MUTUAL INSURANCE COMPANY, Defendant and Appellant.

*May 11—June 6, 1967.*

434

For the appellant there was a brief by *Robert G. Hartman* of Juneau, attorney, and *W. Scott Van Alstyne, Jr.*, of Madison of counsel, and oral argument by *Mr. Van Alstyne.*

For the respondents there was a brief by *Jack McManus*, attorney, and *Larry Haukom* of counsel, both of Madison, and oral argument by *Mr. McManus.*

CURRIE, C. J.   The sole question to be decided on this appeal is whether the trial court's finding that LaCaria did not stand *in loco parentis* to the two minor plaintiffs is against the great weight and clear preponderance of the evidence.

Before reviewing the evidence we deem it advisable to fix the legal signification of the term *in loco parentis.*

In 67 C. J. S., Parent & Child, p. 803, sec. 71, the term *in loco parentis* is defined as:

". . . in the place of a parent; instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities; more specifically, the relationship which a person assumes toward a child not his own, holding the child out to the world as a member of his family toward whom he owes the discharge of parental duties. . . . [T]he accepted definition of a person in loco parentis is one who *means* to put himself in the situation of a lawful parent to the child with respect to the office and duty of making provision for it; one assuming the parental character and discharging parental duties; a person standing in loco parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption." (Emphasis supplied.)

Quoting further from the same text, page 804, sec. 72:

"The assumption of the relation is a question of intention, and not of chance, which may be shown by the acts

and declarations of the persons alleged to stand in that relation."

On the prior appeal we stated:

"A person stands *in loco parentis* to a minor child if he has assumed the status and obligation of a parent without a formal adoption. Whether or not this relationship exists is a matter of *intent* to be deduced from the facts of a particular case." (Emphasis supplied.) [2]

We also stated that factors to be considered, in determining whether a person stands *in loco parentis,* include the children's ages, their dependence upon the person claimed to stand *in loco parentis,* and whether such person in fact supports the children and exercises the duties and obligations of a natural parent.[3]

An excellent discussion of the relationship *in loco parentis* is found in the New York case of *Rutkowski v. Wasko.*[4] In that case a stepson brought an action to recover for injuries allegedly resulting from his stepfather's negligence with respect to the operation of an automobile. The court held the parental-immunity doctrine was applicable to one standing *in loco parentis* to a minor child. In the course of its opinion it stated:

"*In loco parentis* refers to a person who has fully put himself in the situation of a lawful parent by assuming *all* the obligations incident to the parental relationship and who actually discharges those obligations. A stepfather who furnishes a bed and provides bread for a minor son of his wife by a former marriage and who exercises some control over him does not, by those acts alone, establish a parental relationship. To establish such a relationship, there must be in addition to those factors, an affinity whereby the stepfather has a true interest in the well-being and general welfare of his stepson. The assumption of the parental relationship is largely a ques-

---

[2] Footnote 1, *supra,* at page 337.

[3] Id. at page 337.

[4] (1955), 286 App. Div. 327, 143 N. Y. Supp. (2d) 1.

tion of intention which should not lightly or hastily be inferred, but which may be shown by the acts and declarations of the person alleged to stand in that relation. (*Miller v. United States*, 123 F. 2d 715, 717; *Leyerly v. United States*, 162 F. 2d 79.) Whether the relationship exists in any particular case will depend on all the facts and circumstances involved. (*Niewiadomski v. United States*, 159 F. 2d 683; *Matter of Lutz*, 201 Misc. 539.) The relationship should be found to exist only if the facts and circumstances show that the stepparent *means* to take the place of the lawful father not only in providing support but also with reference to the natural father's office of educating and instructing and caring for the general welfare of the child. Whether a stepfather with whom a minor resides stands *in loco parentis* is generally a question of fact to be resolved in the same manner as other factual problems arising in common-law actions. Where the evidence on the issue is in conflict or where different inferences may reasonably be drawn from the evidence, the issue should not be resolved as a matter of law." [5]

On July 1, 1956, Charlotte Ponce, a divorcee with two children, the minor plaintiffs in this action, married LaCaria in New York. At the time of the marriage Thomas and Victoria Ponce were four and five years of age respectively. Their natural father had neither their legal custody nor their *de facto* custody at any time following his divorce from Charlotte Ponce. He was not legally obligated to support them by the decree entered in the divorce action in Cook county, Illinois, and did not do so in fact.

On May 20, 1957, a child, JoMarie LaCaria, was born of the new marriage, and the Ponce children, who for a time were staying with their maternal grandparents at Waupun, Wisconsin, came to live in the LaCaria home. LaCaria expressed dissatisfaction over the fact that the Ponce children were living with them and on different occasions requested that they be returned to their ma-

[5] Id. at page 331.

ternal grandparents. Mrs. LaCaria testified that LaCaria did not want them and that he suggested "if it would be just his own child and him and I, we would get along beautifully."

LaCaria testified that when the three children were at their grandparents' home he sent $20 a week for support but that it was only for his daughter, JoMarie, and not for the Ponce children.

On November 25, 1961, Charlotte and Joseph LaCaria obtained a legal separation. The couple reconciled approximately nine months later. During the time of the separation LaCaria furnished no support.

Upon reconciliation the LaCarias came to Wisconsin to reside. Through 1962, and until the date of the accident, January 20, 1963, Joseph and Charlotte LaCaria together with the three children lived in Madison, Wisconsin, where he pursued his occupation as a hair stylist. Mrs. LaCaria worked part time as a saleslady and as a musician. The 1962 Wisconsin income-tax return reflected Joseph LaCaria's earnings for that year as $2,245 and Mrs. LaCaria's as $233.76.

Mr. and Mrs. LaCaria, JoMarie LaCaria, and the two stepchildren lived together as one household. LaCaria provided most of the support for the stepchildren although Mrs. LaCaria made some contributions. For example the rent was $130 per month of which he paid $100 and she $30. She also claimed she contributed 15 to 20 percent of the food bill, paid their medical and dental bills and bought their clothing. However, in an adverse examination before trial she testified, "Everything is supported by him [Joseph LaCaria]."

In eight years LaCaria disciplined the Ponce children only once. He testified that was when "I was upset because I was baby sitting every night and when my wife was working and I got a little provoked at Tommy one time and gave him a spanking with a hairbrush and

that's the only time I have ever." Although the children called him "father" they testified they did not consider him their father.

LaCaria neither made nor discussed providing for the future education and security of the Ponce children. However, for that matter he did not do so with respect to his own daughter, JoMarie.

Once when LaCaria was at work as a hairdresser Victoria, then a girl eleven or twelve years old, came into the salon. A lady customer asked him if Victoria was his sister, to which he replied, "Yes." However, a desire to impress the customer with his own youthfulness may have prompted this reply and we regard it as of little significance.

LaCaria expressed concern and marked dissatisfaction over the fact that Mr. Ponce never sent any money to support the Ponce children and on one occasion remarked to his wife, "You are working to pay for two children that aren't even mine and you are never home and—"

The testimony was that the minor plaintiffs kept the name of Ponce and did not go by the name of LaCaria. However, the complaint stated the names of the two plaintiffs as "Thomas LaCaria" and "Victoria Ponce LaCaria." When the question of whether the Ponce children should change their surname to LaCaria was brought up LaCaria suggested they retain the surname Ponce. He never discussed adopting the children although the record makes it clear that he liked them.

Subsequent to the accident the LaCarias were divorced and thus the household had been broken up prior to trial.

Upon these facts we consider the issue to be extremely close as to whether the trial court's finding on the *in loco parentis* issue is against the great weight and clear preponderance of the evidence.[6] Because the intent of the

---

[6] See *Wooden v. Hale* (Okla. 1967), 426 Pac. (2d) 679, wherein a stepfather was held immune from suit by his seventeen-year-old stepdaughter because the pleadings admitted the minor plaintiff

stepfather is the all-important factor which must be deduced from the facts presented, we cannot hold otherwise but that a reasonable basis existed for the trial court's deduction that LaCaria did not intend to assume the status and obligations of a parent to the minor plaintiffs.

A trial court's finding of fact made on conflicting evidence should not be set aside if a judicial mind could, on due consideration of the evidence as a whole, reasonably have reached that conclusion.[7] Therefore, we affirm the finding that the relationship of *in loco parentis* did not exist.

*By the Court.*—The judgment and amended judgment are affirmed.

was living in the family home with her mother and stepfather, and was being supported and maintained as a member of the family by the stepfather.

[7] *Estate of Larsen* (1959), 7 Wis. (2d) 263, 273, 274, 96 N. W. (2d) 489; *C. Heinecke Co. v. Cardinal Boiler & Welding Corp.* (1962), 16 Wis. (2d) 493, 498, 114 N. W. (2d) 869; *Guinther v. Schucht* (1965), 26 Wis. (2d) 97, 102, 131 N. W. (2d) 861.