188 P.3d 497 (2008)
Stacey ZELLMER, individually and as copersonal representative of the estate of Ashley Cay McLellan; and Bruce McLellan, individually and as copersonal representative of the estate of Ashley Cay McLellan, Petitioners,
v.
Joel ZELLMER, Respondent.
No. 78852-9.
Supreme Court of Washington, En Banc.
Argued May 22, 2007.
Decided July 24, 2008.
*498 Eric William Lindell, Lindell Law Offices, Seattle, WA, for Petitioner.
Joseph D. Hampton, Catherine Elaine Pruett, Daniel L. Syhre, Betts, Patterson & Mines, P.S., Seattle, WA, for Respondent.
MADSEN, J.
¶ 1 Three-year-old Ashley McLellan drowned in a backyard swimming pool while under the supervision of her stepfather, Joel Zellmer. The trial court ruled the parental immunity doctrine shields Zellmer from liability for negligence in connection with her death. Petitioners Stacey Ferguson[1] and Bruce McLellan, Ashley's biological parents, challenge that ruling. They contend the parental immunity doctrine should be abolished in favor of a reasonable parent standard. Alternatively, they argue the doctrine does not apply under the facts of this case.
¶ 2 We reaffirm that the doctrine of parental immunity precludes liability for negligent parental supervision, but not for a parent's wanton or willful failure to supervise a child. See Jenkins v. Snohomish County Pub. Util. Dist. No. 1, 105 Wash.2d 99, 713 P.2d 79 (1986). We decline to recognize an exception for wrongful death actions. We further hold the parental immunity doctrine shields a stepparent to the same extent as a biological or adoptive parent, so long as the stepparent stands in loco parentis to the child. However, we agree with petitioners that summary judgment was improper because Zellmer's loco parentis status is a question of fact that may not be decided as a matter of law on this record. Thus, we reverse the summary judgment order.

FACTS
¶ 3 About four months after they met, Ferguson and Zellmer got married. Clerk's Papers (CP) at 6-7, 26, 69. Ferguson had a three-year-old daughter, Ashley, from a previous marriage. They moved to Zellmer's house on the day of the marriage, September 6, 2003. Ordinarily, Ashley went to day care while Ferguson worked. On December 3, 2003, however, Ashley stayed home sick. Id. at 71. Zellmer agreed to take care of her.
¶ 4 According to Zellmer, at about 5:00 p.m. he started a video for Ashley in her bedroom and then went downstairs to build a fire. About an hour later, he realized she was no longer in her room. He noticed the sliding glass door leading to the backyard was open. He went outside and found Ashley floating in the swimming pool. He pulled her out and called 911. The paramedics resuscitated Ashley, but she died in the hospital two days later.
¶ 5 Ferguson and McLellan sued Zellmer for wrongful death, alleging several causes of action including negligence, negligent supervision, willful and wanton misconduct, breach of contract, negligent infliction of emotional distress, and outrage. Id. at 11-13.
*499 ¶ 6 Zellmer moved for summary judgment. He claimed the parental immunity doctrine shielded him from liability for negligence in connection with Ashley's death. Id. at 20. He asserted he stood in loco parentis to Ashley because he provided her financial and emotional support, including housing, meals, and day care. According to Zellmer, Ashley referred to him as "Daddy," and he treated her as his own daughter.
¶ 7 In opposition to the summary judgment motion, Ferguson disputed Zellmer's characterization of his relationship with Ashley. She denied Zellmer supported Ashley financially. She said he was unemployed throughout their marriage and she and McLellan provided for Ashley's needs. According to Ferguson, Ashley spent little time with Zellmer and was still uncomfortable around him on the day she drowned. She said "Joel and Ashley were not even close and Joel did not stand in place of a parent for Ashley." Id. at 71. She said Zellmer was "impatient and short with Ashley and acted in an intimidating manner to her." Ferguson did not allow him to discipline Ashley because she did not think he knew her well enough to do so. Id.
¶ 8 A visitor to Zellmer's house said she witnessed an argument between Zellmer and Ferguson, following which Zellmer called Ashley "a little bitch." Id. at 66.
¶ 9 Ferguson described the 88 days she and Ashley lived with Zellmer as "marked by turmoil." Id. at 69. She claimed Zellmer assaulted her twice, causing her to take Ashley and go stay with her parents. On the day Ashley drowned, Ferguson moved out of Zellmer's house permanently.
¶ 10 McLellan stated he paid child support for Ashley and exercised his visitation rights regularly following the dissolution of his marriage to Ferguson. Id. at 63, 68. According to McLellan, he paid half of Ashley's day care and medical insurance and continued to provide financial and emotional support. Ashley always referred to him as "Dad," and referred to Zellmer as "Joel." Id. at 64. He was actively involved in Ashley's life as her father since the day she was born and intended to do so until he died. "Based on my observations it would be inaccurate to say that Ashley ever hoped that Joel Zellmer would play a parental role in her life." Id.
¶ 11 Ferguson also cast doubt on Zellmer's version of the events surrounding Ashley's death. She said Ashley never would have wandered outside in her pajamas on a cold December night or gone to the unheated swimming pool, which was located in a far corner of the property. Id. at 72. She said a few days after they married, Zellmer purchased a $200,000 accidental death insurance policy for Ashley, naming himself as cobeneficiary. Id. Ferguson pointed to an ongoing criminal investigation of Ashley's death and Zellmer's refusal to cooperate with the police, as evidence the drowning resulted from his intentional misconduct.
¶ 12 The trial court granted summary judgment in favor of Zellmer. The trial court criticized the parental immunity doctrine but reasoned so long as the doctrine remains viable in Washington, it should apply to stepparents as well as to natural parents. The trial court concluded Zellmer necessarily stood in loco parentis to Ashley by virtue of assuming the status of stepparent: "when there is a marriage ceremony and there is a blended family and someone becomes a stepparent that the doctrine of parental immunity applies, and there does not have to be a finding of in loco parentis." Verbatim Report of Proceedings (VRP) (Nov. 5, 2004) at 9.
¶ 13 On appeal, the Court of Appeals recognized stepparents "do not earn the benefit of immunity simply by virtue of marriage to a legal parent." Zellmer v. Zellmer, 132 Wash.App. 674, 681, 133 P.3d 948 (2006). Reasoning that parental immunity is a "reciprocal benefit arising from a legally enforceable financial responsibility," id., the Court of Appeals held a stepparent who is obligated to financially support a stepchild under the family support statute, RCW 26.16.205, is shielded by parental immunity from liability for negligent supervision of the child. Zellmer, 132 Wash.App. at 682, 133 P.3d 948. Because such an obligation generally arises when a stepparent is married to the child's primary residential parent and lives in the same household with the child, *500 the Court of Appeals concluded such a stepparent would be protected by parental immunity, except in "rare circumstances." Finding no such exceptional circumstances here, the Court of Appeals affirmed the trial court.
¶ 14 We accepted review of the Court of Appeals decision. Zellmer v. Zellmer, 159 Wash.2d 1008, 154 P.3d 919 (2007).

ANALYSIS
¶ 15 Petitioners urge us to abolish the parental immunity doctrine. They assert the rule of parental immunity lacks modern justification and should be discarded in favor of a "reasonable parent" standard in cases of negligent supervision.
¶ 16 In its original form, the parental immunity doctrine operated as a nearly absolute bar to suit by a child for personal injuries caused by a parent, no matter how wrongful the parent's conduct. See, e.g., Roller v. Roller, 37 Wash. 242, 79 P. 788 (1905) (father raped daughter); McKelvey v. McKelvey, 111 Tenn. 388, 77 S.W. 664 (1903) (stepmother inflicted cruel and inhumane treatment on stepson); Hewellette v. George, 68 Miss. 703, 9 So. 885 (1891) (mother falsely imprisoned child in insane asylum). The parental immunity doctrine originated in three decisions near the turn of the last century and was quickly adopted by most states. See Gale D. Hollister, Parent-Child Immunity: A Doctrine in Search of a Justification, 50 FORDHAM L.REV. 489, 494 (1981). From its inception, however, the doctrine has been subject to extensive critical commentary. Id. Like other courts, this court has disavowed several of the original rationales underlying the doctrine, while sharply limiting its scope. Today, no jurisdiction recognizes the original formulation of the common law parental immunity doctrine, and we need not repeat our reasons for retreating from it. See Merrick v. Sutterlin, 93 Wash.2d 411, 610 P.2d 891 (1980); Borst v. Borst, 41 Wash.2d 642, 251 P.2d 149 (1952).
¶ 17 The evolution of the parental immunity doctrine in Washington is consistent with the national trend. Washington was one of the first states to recognize the parental immunity doctrine. Roller, 37 Wash. 242, 79 P. 788. However, this court has exercised its continuing duty to determine whether the doctrine remains supported by reason and common sense in view of changing social realities, and to modify it as necessary. See Borst, 41 Wash.2d at 657, 251 P.2d 149 (the rule of stare decisis is less compelling in the context of deciding the scope of the common law parental immunity rule). Like other jurisdictions, this court has substantially limited the scope of parental immunity in accordance with changing views of public policy on the family relation. A parent is not immune when acting outside his or her parental capacity. See Merrick, 93 Wash.2d 411, 610 P.2d 891 (operating a motor vehicle); Borst, 41 Wash.2d 642, 251 P.2d 149 (driving a business truck). For example, when operating a business or driving a car, a parent owes a child the same duty of reasonable care applicable to the world at large, and may be held liable notwithstanding the parent/child relationship. Even when acting in a parental capacity, a parent who abdicates his or her parental responsibilities by engaging in willful or wanton misconduct is not immune from suit.[2]See Hoffman v. Tracy, 67 Wash.2d 31, 406 P.2d 323 (1965) (driving while intoxicated); Livingston v. City of Everett, 50 Wash. App. 655, 660, 751 P.2d 1199 (1988) (parent left four-year-old child unattended in a small room with two Doberman pinschers).
¶ 18 But this court has consistently held a parent is not liable for ordinary negligence in the performance of parental responsibilities. Jenkins, 105 Wash.2d 99, 713 P.2d 79 (disallowing contribution claim where parents allowed child to wander free in neighborhood; child electrocuted at utility power station); Talarico v. Foremost Ins. Co., 105 Wash.2d 114, 712 P.2d 294 (1986) (disallowing negligent supervision claim where parent started backyard fire then left three-year-old son unattended, resulting in severe burns); Baughn v. Honda Motor Co., 105 Wash.2d 118, 119, 712 P.2d 293 (1986) (disallowing *501 contribution claim where parents allowed sight-impaired child to ride motorbike, resulting in fatal crash); Stevens v. Murphy, 69 Wash.2d 939, 421 P.2d 668 (1966) (disallowing suit against divorced parent who negligently injured children while transporting them home from a scheduled visitation), overruled in part by Merrick, 93 Wash.2d at 413, 610 P.2d 891; DeLay v. DeLay, 54 Wash.2d 63, 337 P.2d 1057 (1959) (disallowing negligence action against parent who instructed son to siphon gas, resulting in burn injuries); Cox v. Hugo, 52 Wash.2d 815, 329 P.2d 467 (1958) (disallowing contribution claim against parent who failed to prevent child from wandering into neighbor's yard where she was burned by trash fire).
¶ 19 There are two principal routes by which courts have concluded that children may not sue their parents for negligent supervision. Under the approach first articulated by the Wisconsin Supreme Court, courts recognize a limited form of parental immunity for personal injuries resulting from the negligent exercise of parental authority and ordinary parental discretion. Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193 (1963). The American Law Institute subsequently approved Goller, although the approach codified in the Restatement is grounded in a concept of parental privilege rather than immunity. See RESTATEMENT (SECOND) OF TORTS § 895G (1979). Under the Restatement, "the proper inquiry concerns the tortious or privileged nature of a parent's act that causes injury to the child, not a special parental immunity from a child's action for personal torts as distinct from other kinds of claims." Winn v. Gilroy, 296 Or. 718, 681 P.2d 776, 784 (1984). Parents are not immune from suit by virtue of the parent/child relationship. The Restatement recognizes that in the course of exercising parental discipline and parental discretion, parents may be privileged to act in a manner that would be deemed tortious if directed at a stranger. RESTATEMENT, supra, § 895G (repudiation of general tort immunity does not create new liabilities for parents for conduct otherwise privileged or not tortious based on the parent/child relationship); Rousey v. Rousey, 528 A.2d 416 (D.C.App.1987).
¶ 20 States that either abolished the parental immunity doctrine or declined to adopt it in the first instance nonetheless have followed the Restatement, disallowing negligent supervision claims based on the concept of a parental privilege. See Brunner v. Hutchinson Div., 770 F.Supp. 517, 525 (D.S.D.1991) (parental privilege must be construed broadly enough to respect the sphere of parental discretion and avoid judicial second-guessing of parental judgment); Winn, 681 P.2d at 786 (permitting action by child based on negligent parental driving while recognizing an action will not lie where the defendant's conduct was "either not tortious or privileged by virtue of the parental relationship").
¶ 21 There now appears to be nearly universal consensus that children may sue their parents for personal injuries caused by intentionally wrongful conduct.[3] However, the overwhelming majority of jurisdictions hold parents are not liable for negligent supervision of their child, whether stated in terms of a limited parental immunity (among jurisdictions that have partially abrogated the parental immunity doctrine), parental privilege (among those that either abolished the immunity doctrine outright or declined to adopt it in the first instance), or lack of an actionable parental duty to supervise. See Holodook v. Spencer, 36 N.Y.2d 35, 324 N.E.2d 338, 364 N.Y.S.2d 859 (1974) (declining to recognize cause of action for negligent supervision claim following abrogation of parental immunity doctrine); Romualdo P. Eclavea, Annotation, Liability of Parent for Injury to Unemancipated Child. Caused by Parent's *502 Negligence-Modern Cases, 6 A.L.R.4th 1066, § 14 (1981) (collecting case where negligent supervision claims are barred notwithstanding abolition of parental immunity); Barbara A. Micheels, Is Justice Served? The Development of Tort Liability Against the Passive Parent in Incest Cases, 41 St. Louis L.J. 809, 842 n. 231 (1997) (summarizing the status of the tort of negligent parental supervision claims in the 50 states).
¶ 22 A minority of states have followed the lead of the California Supreme Court, allowing children to sue parents for negligent supervision under a "reasonable parent" standard. Gibson v. Gibson, 3 Cal.3d 914, 479 P.2d 648, 92 Cal.Rptr. 288 (1971) (remanding for trial where son was struck by car after entering highway at father's direction); Broadbent v. Broadbent, 184 Ariz. 74, 907 P.2d 43 (1995) (remanding for trial where child fell into swimming pool and nearly drowned while mother left to answer telephone); Hartman v. Hartman, 821 S.W.2d 852 (Mo.1991) (remanding for trial where propane gas stove exploded during family camping trip, injuring child); Miller v. Leljedal, 71 Pa.Cmwlth. 372, 455 A.2d 256 (1983) (remanding for trial where parent allowed child to play unsupervised near highway, where he was struck by car); Anderson v. Stream, 295 N.W.2d 595 (Minn.1980) (remanding for trial where child was injured during unsupervised backyard play while parents did housework and read newspaper).
¶ 23 In a trio of cases decided in 1986, we "reaffirmed the vitality of the doctrine of parental immunity with respect to assertions of negligent supervision." Baughn, 105 Wash.2d at 119, 712 P.2d 293 (disallowing contribution action by tortfeasor against parents for negligent supervision); Jenkins, 105 Wash.2d at 103, 713 P.2d 79 (same) (citing Gibson, 3 Cal.3d 914, 92 Cal.Rptr. 288, 479 P.2d 648); Talarico, 105 Wash.2d 114, 712 P.2d 294 (disallowing suit by child for negligent parental supervision). We expressly rejected the "reasonable parent" standard and concluded the better approach was to continue to recognize a limited form of parental immunity in cases of ordinary negligence when a parent is acting in a parental capacity. In explaining our decision, we stated:
"Parents should be free to determine how the physical, moral, emotional, and intellectual growth of their children can best be promoted." Foldi [v. Jeffries], 93 N.J. [533,] 545, 461 A.2d [1145,] 1152 [ (1983).] Parents should not routinely have to defend their child-rearing practices where their behavior does not rise to the level of wanton misconduct. There is no correct formula for how much supervision a child should receive at a given age.
Jenkins, 105 Wash.2d at 105, 713 P.2d 79.
¶ 24 The petitioners offer no persuasive arguments for overruling Jenkins, Baughn, and Talarico. Instead, they direct much of their criticism at long-discarded rationales underlying the original form of the parental immunity doctrine. Following Jenkins, the primary objective of the modern parental immunity doctrine is to avoid undue judicial interference with the exercise of parental discipline and parental discretion. This rationale remains as vital today as it was in 1986. Parents have a right to raise their children without undue state interference. In re Custody of Brown, 153 Wash.2d 646, 652, 105 P.3d 991 (2005) (citing In re Custody of Smith, 137 Wash.2d 1, 20-21, 969 P.2d 21 (1998), aff'd sub nom. Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)); see also Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (right of Amish parents not to send kids to school after eighth grade); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (right of parents to send kids to parochial school). In exercising that right, parents are in need of a "wide sphere of discretion." Borst, 41 Wash.2d at 656, 251 P.2d 149.
¶ 25 The petitioners argue the parental immunity doctrine is inconsistent with our abolition of interspousal tort immunity. See Freehe v. Freehe, 81 Wash.2d 183, 500 P.2d 771 (1972), overruled in part by Brown v. Brown, 100 Wash.2d 729, 675 P.2d 1207 (1984). The concurrence/dissent similarly points to the erosion of judicial support for tort immunity as a basis for declining to extend the parental immunity doctrine to stepparents. Concurrence/dissent at 508 n. 2. Unlike in the case of interspousal tort *503 immunity, however, an important public policy interest continues to justify a limited form of parental immunity. The parental immunity doctrine is similar to the "discretionary functions" exception applicable under the federal tort claims act and the "business judgment rule," which protects the discretionary decision-making of business executives. See United States v. Gaubert, 499 U.S. 315, 321-23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (discussing discretionary functions exception); Scott v. Trans-System, 148 Wash.2d 701, 709, 64 P.3d 1 (2003) (discussing business judgment rule); Taggart v. State, 118 Wash.2d 195, 214-15, 822 P.2d 243 (1992) (discussing discretionary governmental immunity exception to Washington's waiver of soverign immunity). In each instance, the purpose of immunity is to provide sufficient breathing space for making discretionary decisions, by preventing judicial second-guessing of such decisions through the medium of a tort action. Petersen v. State, 100 Wash.2d 421, 433-34, 671 P.2d 230 (1983) (scope of discretionary governmental immunity no broader than necessary to provide sufficient breathing space for making discretionary decisions); Gaubert, 499 U.S. at 322-23, 111 S.Ct. 1267.
¶ 26 Even those states that have adopted the "reasonable parent" standard recognize that holding parents liable for ordinary negligence in connection with the discharge of parental duties threatens to unduly interfere with the parent/child relationship. See, e.g., Broadbent, 184 Ariz. at 80, 907 P.2d 43 (acknowledging the need "to protect the right of parents to raise their children by their own methods and in accordance with their own attitudes and beliefs"); Hartman, 821 S.W.2d at 856 ("What remains of concern is the interest in avoiding subversion of parental care, control, and discipline."); Gibson, 3 Cal.3d at 921, 92 Cal.Rptr. 288, 479 P.2d 648 ("`Since the law imposes on the parent a duty to rear and discipline his child and confers the right to prescribe a course of reasonable conduct for its development, the parent has a wide discretion in the performance of his parental functions. . . .'") (quoting Emery v. Emery, 45 Cal.2d 421, 430, 289 P.2d 218 (1955)).
¶ 27 The reasonable parent standard does not adequately protect against undue judicial interference in the parent/child relationship. First, it should be noted that substituting "parent" for "person" is of little consequence, as a judge or jury always is required to consider the status of the actor in applying the reasonable person standard in a negligence case. Thus, the "reasonable parent" standard is, in fact, the ordinary negligence standard. Subjecting parents to liability for negligent supervision inevitably allows judges and juries to supplant their own views for the parent's individual child-rearing philosophy.
¶ 28 Thus, we continue to agree with those jurisdictions that have declined to permit an action for negligent parental supervision, as it accords too little respect for family autonomy and parental discretion. See, e.g., Brunner, 770 F.Supp. 517 (parent is privileged from liability for negligent supervision); Winn, 296 Or. 718, 681 P.2d 776 (rejecting reasonable parent standard in favor of Restatement approach); Foldi, 93 N.J. at 545, 461 A.2d 1145 (rejecting reasonable parent standard in favor of a limited parental functions immunity); Pedigo v. Rowley, 101 Idaho 201, 610 P.2d 560 (1980) (adopting exceptions for parental authority and discretion rather than reasonable parent standard); Plumley v. Klein, 388 Mich. 1, 8, 199 N.W.2d 169 (1972) (abolishing parental immunity doctrine while retaining exceptions for negligent parental supervision and negligent discharge of parental duties); Holodook, 36 N.Y.2d 35, 364 N.Y.S.2d 859, 324 N.E.2d 338 (declining to recognize negligent parental supervision claim following abrogation of parental immunity doctrine); Felderhoff v. Felderhoff, 473 S.W.2d 928, (Tex.1971); see also Sandra L. Haley, The Parental Tort Immunity Doctrine: Is it a Defensible Defense, 30 U. Rich. L.Rev. 575 (1996) (favoring Restatement approach over the reasonable parent standard).
¶ 29 We adhere to the parental immunity doctrine as it relates to claims of negligent parental supervision. We reaffirm our holding in Jenkins that parents are immune from suit for negligent parental supervision, but not for willful or wanton misconduct in *504 supervising a child. Jenkins, 105 Wash.2d at 105-06, 713 P.2d 79.
¶ 30 The petitioners ask us to adopt an exception in cases where the alleged negligence results in a child's death. They argue the parental immunity doctrine lacks justification when the parent/child relationship no longer exists. We find the argument unpersuasive. The primary purpose of the doctrine is to avoid the chilling effect tort liability would have on a parent's exercise of parental discipline and parental discretion. See Borst, 41 Wash.2d at 656, 251 P.2d 149 ("If such suits were common-place, or even possible, the freedom and willingness of the father and mother to provide for the needs, comforts and pleasures of the family would be seriously impaired. Public policy therefore demands that parents be given immunity from such suits while in the discharge of parental duties."). In view of that purpose, whether the conduct complained of results in death rather than some lesser injury affords no reasonable basis for distinction.
¶ 31 Courts that have held to the contrary based their decision on the "family harmony" rationale, which this court has renounced. See id. at 650, 251 P.2d 149 (characterizing that purpose as "futile" because when a child brings suit the family harmony either already has been disturbed beyond repair by the injury-causing conduct or will not be threatened because of liability insurance). As stated by the Court of Appeals, Division Three: "Since the underlying reasons for granting parental immunity are unaffected by the demise of a family member, the mere fact the cause of action is for wrongful death will not abrogate the parental immunity doctrine." Chhuth v. George, 43 Wash.App. 640, 647, 719 P.2d 562 (1986) (denying contribution claim against parent for negligent supervision of child who was fatally injured while crossing the street).
¶ 32 Next, petitioners argue it would be inappropriate to extend the parental immunity doctrine to stepparents in view of the modern trend to limit or abolish it.
¶ 33 Notwithstanding the limitations courts have placed on the scope of conduct shielded by the parental immunity doctrine, a majority of states addressing the issue hold it applies to stepparents who stand in loco parentis to the same extent as to legal parents. Unah v. Martin, 676 P.2d 1366 (Okla.1984); Lyles v. Jackson, 216 Va. 797, 223 S.E.2d 873 (1976); McManus v. Hinney, 35 Wis.2d 433, 151 N.W.2d 44 (1967); Gunn v. Rollings, 250 S.C. 302, 157 S.E.2d 590 (1967); London Guar. & Acc. Co. v. Smith, 242 Minn. 211, 64 N.W.2d 781 (1954); Rutkowski v. Wasko, 286 A.D. 327, 143 N.Y.S.2d 1 (App.Div.1955); Bricault v. Deveau, 21 Conn.Supp. 486, 157 A.2d 604 (1960); McGee v. McGee, 936 S.W.2d 360 (Tex.App.1996); Barry v. Schorling, 2 Ohio App.3d 110, 440 N.E.2d 1216 (1981); see also Eclavea, supra, § 2[a], at 1071, § 4 at 1087.
¶ 34 Authority to the contrary exists only in jurisdictions where stepparents either have no legal obligation to support a child, see Rayburn v. Moore, 241 So.2d 675 (Miss. 1970), or where parental immunity otherwise bars suit in the case of motor vehicle torts,[4]see C.M.L. v. Republic Servs., 800 N.E.2d 200 (Ind.Ct.App.2003) (declining to extend immunity to a stepfather who ran over child with a garbage truck); Warren v. Warren, 336 Md. 618, 650 A.2d 252 (1994) (retaining parental immunity for motor vehicle torts while declining to extend it to stepparents); Burdick v. Nawrocki, 21 Conn.Supp. 272, 154 A.2d 242 (1959) (declining to extend parental immunity to stepparent who negligently crashed tractor trailer). In recognition of the waning support for a broad rule of parental immunity, these jurisdictions have restricted its application to biological or adoptive parents, thus limiting the scope of persons to whom it applies rather than the range of conduct it protects.
¶ 35 This court has, more appropriately, limited the scope of conduct protected by the *505 parental immunity doctrine to conform to changing societal views about the appropriate boundaries of parental discretion. State interference in the parent/child relationship is deemed justified under a broader range of circumstances than formerly recognized. Our legislature has narrowed the range of unfettered parental discretion through the enactment of statutes designed to protect children from abuse and exploitation. Because this court already has placed appropriate limitations on the scope of the parental immunity doctrine to accord with its modern rationale, restricting the scope of parental immunity to biological and adoptive parents is unwarranted.[5]
¶ 36 No court has allowed a stepparent to claim parental immunity solely by virtue of his or her marriage to the injured child's biological parent. Warren, 336 Md. at 628, 650 A.2d 252. This is consistent with the common law rule that a stepparent gains no parental rights and assumes no obligations merely by reason of the relationship. 67A C.J.S. Parent and Child § 352 (2008); 59 Am.Jur.2d Parent and Child § 12 (2008). On the other hand, a stepparent standing in loco parentis has a common law duty to support and educate a child to the same extent as does a natural parent. State ex rel. Gilroy v. King County, 37 Wash.2d 926, 933, 226 P.2d 882 (1951).
¶ 37 The term "in loco parentis" means, "[i]n the place of a parent; instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities." BLACKS LAW DICTIONARY 787 (6th ed.1990). It refers to a person who has put himself or herself in the situation of a lawful parent by assuming all obligations incident to the parental relation without going through the formalities of legal adoption and embodies the two ideas of assuming the status and discharging the duties of parenthood.
¶ 38 We agree with those courts that find no principled distinction between a legal parent and a stepparent who assumes all the obligations and exercises all the responsibilities of parenthood, as the public policy reasons supporting immunity for a biological or adoptive parent apply equally to one standing in loco parentis. As the Court of Appeals stated, stepparents need the same "wide sphere of discretion as legal parents" when they have assumed the responsibility to discipline and educate a child. Zellmer, 132 Wash.App. at 680, 133 P.3d 948; see also Rutkowski, 286 A.D. at 330-31, 143 N.Y.S.2d 1 ("No good reason appears why the rule should be applied in the case of a parent and not in the case of one standing completely in loco parentis. If the foundations for its application are sound in the one instance, they must be equally so in the other, and there is no justification for refusing to apply it to a stepparent who actually exercises all the parental prerogatives and who discharges all the parental obligations."); London, 64 N.W.2d at 784 ("If a stepfather has voluntarily assumed all the obligations and beneficient attitudes of a natural parent toward an unemancipated minor child, it is difficult to understand why he should be denied any of the immunities from suit accorded for reasons of public policy to a natural parent." (emphasis added)).
¶ 39 A stepparent may or may not act as a parent with respect to a given child. Whether a stepparent stands in loco parentis is primarily a question of intent to be determined in view of the facts of each case. State ex rel. Gilroy v. Superior Court, 37 Wash.2d 926, 934, 226 P.2d 882 (1951); In re Montell, 54 Wash.App. 708, 712-13, 775 P.2d 976 (1989); London, 64 N.W.2d at 785. The intention required to create an in loco parentis relationship "should not lightly or hastily be inferred." McManus v. Hinney, 35 Wis.2d 433, 437-38, 151 N.W.2d 44 (1967). The relevant focus is the stepparent's overall *506 relationship with the child, rather than with the particular conduct upon which the child's complaint is based. McGee, 936 S.W.2d at 369.
¶ 40 The Court of Appeals held "stepparents who are obligated to support stepchildren under the family support statute are protected by the immunity doctrine to the same extent as legal parents." Zellmer, 132 Wash.App. at 683, 133 P.3d 948. We agree with the rule adopted by the Court of Appeals, but disagree with its application to the facts of this case. Washington's family support statute merely codifies the common law rule that a stepparent standing in loco parentis must provide support for a stepchild. Van Dyke v. Thompson, 95 Wash.2d 726, 630 P.2d 420 (1981). Thus, a stepparent is not subject to the family support statute unless he or she has established a loco parentis relationship with a child, which requires more than merely taking a child into one's home or exercising temporary custody and control. See Gilroy, 37 Wash.2d at 934, 226 P.2d 882; Montell, 54 Wash.App. at 712, 775 P.2d 976; State v. Gillaspie, 8 Wash.App. 560, 562, 507 P.2d 1223 (1973).
¶ 41 The courts below recognized a stepparent's loco parentis status generally presents a question of fact, but considered a factintensive inquiry inappropriate in the context of deciding the applicability of parental immunity. In the trial court's view, such an inquiry would lead "down the slippery slope of a judge deciding the legal doctrine based on the feelings of the judge or the jury as opposed to what the law is or should be." VRP at 4. The trial court avoided examining the subjective aspects of the stepparent/child relationship by presuming loco parentis status where a stepparent is married to the child's residential parent. In affirming the trial court, the Court of Appeals stated: "In today's world of blended families and shared parenting, the question could generate litigation of precisely the kind the immunity doctrine seeks to prevent: putting hearsay and finger pointing on the main stage in circumstances where hindsight clouds rather than illuminates." Zellmer, 132 Wash.App. at 682-83, 133 P.3d 948.
¶ 42 Although we share the concerns expressed by the lower courts, we believe a factual inquiry into the stepparent/child relationship is necessary to ensure the application of parental immunity does not unjustly deprive a child of the right to seek legal redress. The parent immunity doctrine represents a balance between the child's right to be fairly compensated for personal injuries resulting from another's wrongful conduct and the parents' right to raise a child free from undue judicial interference. The infringement of the child's right is deemed justified in view of several premises, including: the natural bond of affection between a parent and child renders the deterrent purpose of civil liability unnecessary; civil liability is unnecessary to make an injured child whole as a parent already is financially responsible for the child; the intimacy of the parent/child bond makes a parent uniquely situated to judge what is best for a child; and the parent actually has the right to exercise parental discipline and parental discretion on behalf of the child. The loco parentis requirement serves the purpose of ensuring the validity of these premises as applied to a stepparent who claims the protection of parental immunity.
¶ 43 Thus, courts have required stepparents to establish they "genuinely" stand in loco parentis as a condition to claiming the protection of parental immunity. Rutkowski, 286 A.D. at 330, 143 N.Y.S.2d 1; London, 64 N.W.2d at 784.
¶ 44 The loco parentis relationship should be found to exist only if the facts and circumstances show the stepparent intends to assume the responsibilities of a legal parent not only in providing financial support but also with respect to educating, instructing, and caring for the child's general welfare. Rutkowski 286 A.D. at 331, 143 N.Y.S.2d 1. This is generally a question of fact that should not be resolved as a matter of law when the issue is in conflict and different inferences may reasonably be drawn from the evidence.
¶ 45 We agree with the petitioners that a genuine issue of fact exists as to whether Zellmer stood in loco parentis to Ashley. It is undisputed Zellmer had been *507 married to Ashley's primary residential parent for 88 days, he provided Ashley with housing for a majority of that time, and Ashley's mother at least occasionally entrusted her to his care.
¶ 46 If this case involved a controversy as to Zellmer's liability under the family support statute, his declaration of intent to assume the status of parent, in conjunction with his marriage to Ashley's residential parent, would constitute an admission that could support summary judgment on the issue of his loco parentis status. In this case, however, his declaration is self-serving and subject to dispute.
¶ 47 In opposition to summary judgment, the plaintiffs presented evidence Zellmer did not provide financial and emotional support to Ashley, did not treat her as his own daughter, and did not otherwise demonstrate a genuine concern for her welfare characteristic of a parent/child relationship. Moreover, Zellmer was not generally authorized to discipline Ashley or exercise parental discretion on her behalf.
¶ 48 The undisputed facts do not establish as a matter of law that Zellmer stood in loco parentis to Ashley. A stepparent's provision of some support to a child who resides in the same household is insufficient to establish loco parentis status. In re Marriage of Allen, 28 Wash.App. 637, 644, 626 P.2d 16 (1981); see also 28 Am.Jur. Proof of Facts 2d § 545. Exercising temporary custody or control over a child likewise does not establish a loco parentis relationship. Rider v. Speaker, 180 Misc.2d 999, 692 N.Y.S.2d 920 (1999); State v. Voland, 99 Ohio Misc.2d 61, 716 N.E.2d 299 (1999) Mayberry v. Pryor, 422 Mich. 579, 374 N.W.2d 683 (1985); Barbarisi v. Caruso, 47 N.J.Super. 125, 135 A.2d 539 (App.Div.1957); Cwik v. Zylstra, 58 N.J.Super. 29, 155 A.2d 277 (1959); In re Martin, 147 S.W.3d 453 (Tex.App.2004).
¶ 49 In cases where a stepparent's loco parentis status has been deemed beyond reasonable dispute, the facts showed a more substantial parent/child bond than has been established here. See McGee, 936 S.W.2d 360 (stepparent indisputably was "the only father figure" his stepson had ever known, raising him from age 18 months to 17 years); Lawber v. Doil, 191 Ill.App.3d 323, 547 N.E.2d 752. 138 Ill.Dec. 585 (1989) (uncontroverted that stepfather disciplined, advised, and loved stepchild to same extent as his natural children; stepchild was an integrated member of the family unit); Barry v. Schorling. 2 Ohio App.3d 110, 440 N.E.2d 1216 (1981) (uncle indisputably stood in loco parentis to niece, who had been an integrated member of his household for three years); London, 242 Minn. 211, 64 N.W.2d 781 (stepfather provided for his stepson in the same manner and to the same extent as for his natural children, a home, food, clothing, spending money, schooling, and parental guidance and companionship; stepson called him "dad"). Compare Rutkowski, 286 A.D. at 332, 143 N.Y.S.2d 1 (remanding for trial where "there is some proof of support and control but it contains nothing which compels an inference that the defendant had a full and complete parental interest in the wellbeing and general welfare of the infant plaintiff").
¶ 50 Taking into account the short duration of the relationship, and viewing the facts in the light most favorable to the nonmoving party, a genuine issue of material fact exists as to whether Zellmer stood in loco parentis to Ashley. Thus, summary judgment was improper.

CONCLUSION
¶ 51 We confirm the viability of the parental immunity doctrine and hold it applies to a stepparent who genuinely stands in loco parentis to an injured child to the same extent as to a legal parent. We decline to recognize an exception where the alleged negligence resulted in a child's death. However, a genuine issue of material fact exists as to whether Zellmer established a loco parentis relationship with Ashley. Thus, we reverse the summary judgment order and remand for further proceedings consistent with this opinion.
WE CONCUR: RICHARD B. SANDERS, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, JJ., and BOBBE J. BRIDGE, J. Pro Tem.
*508 ALEXANDER, C.J., (concurring/dissenting).
¶ 52 I agree with the majority that the trial court erred in granting summary judgment in favor of Ashley McLellan's stepfather, Joel Zellmer, on the basis that Zellmer's loco parentis status is a question of fact that may not be decided as a matter of law on this record. Therefore, I concur in the majority's decision to the extent that it reverses the trial court's summary judgment order. However, for reasons set forth hereafter, I dissent from the majority's determination that parental immunity should be extended to a stepparent. Consequently, I favor reversing the summary judgment order on grounds that, as a stepparent, Joel Zellmer has no immunity from a suit against him for the wrongful death of Ashley McLellan. That being the case, it is, in my view, unnecessary for us to resolve the question of whether Zellmer was in loco parentis to his stepchild.
¶ 53 The parental immunity doctrine, which we first recognized in Roller v. Roller, 37 Wash. 242, 79 P. 788 (1905), has heretofore applied only to a birth or adoptive parent (hereinafter parent).[1]See Borst v. Borst, 41 Wash.2d 642, 656, 251 P.2d 149 (1952); see also DeLay v. DeLay, 54 Wash.2d 63, 337 P.2d 1057 (1959). This doctrine should not be extended to stepparents for several reasons. The first is that support for the general concept of parental immunity has been steadily eroding over the last several decades in jurisdictions around the nation. We noted this very point over 25 years ago in Merrick v. Sutterlin, 93 Wash.2d 411, 414, 610 P.2d 891 (1980), saying: "The trend of many modern cases is to limit or entirely abolish parental immunity."[2] Indeed, the highest courts in six jurisdictions, Hawaii, Nevada, North Dakota, Utah, Vermont, and the District of Columbia, declined to adopt the doctrine in the first place.[3] Furthermore, courts of last resort in 11 states that once recognized the doctrine have subsequently abolished it.[4] Of the remaining states where parental immunity is still recognized, many have limited the circumstances under which the doctrine can be applied by creating exceptions to its application.[5] Finally, courts in four jurisdictions that recognize the parental immunity doctrine have explicitly refused to extend the *509 same immunity to stepparents.[6]
¶ 54 This court has followed the trend of limiting the circumstances where parental immunity is recognized. In Borst, we examined and renounced many of the policy grounds that were advanced in Roller and succeeding cases as justification for the doctrine of parental immunity. Borst, 41 Wash.2d at 655, 251 P.2d 149. There we declined to extend immunity to a parent whose child suffered injury as a consequence of the parent's negligence in operating a truck for business purposes. Id. at 657-58, 251 P.2d 149. In reaching that conclusion, we stated that "none of the arguments which have been discussed [in the opinion] provides a logical and just basis for an absolute rule of immunity applicable" to parent-child suits. Id. at 655, 251 P.2d 149. Similarly, in Hoffman v. Tracy, 67 Wash.2d 31, 38, 406 P.2d 323 (1965), we affirmed that parental immunity was not applicable when a child was injured by the conduct of a parent that constituted a temporary abdication of parental responsibility, to wit: driving while intoxicated.
¶ 55 In Merrick, we again cited Borst and criticized the grounds used to justify parental immunity, indicating that the doctrine should not apply in cases in which a child is injured by a parent as the result of the parent's negligent operation of an automobile. Merrick, 93 Wash.2d at 413-14, 416, 610 P.2d 891. Additionally, in Livingston v. City of Everett, 50 Wash.App. 655, 660, 751 P.2d 1199 (1988), we held that parental immunity did not apply to shield a parent when the parental conduct resulting in injury to a child was "willful and wanton."
¶ 56 While I am not presently advocating that we overrule the Roller case in which we first adopted the doctrine of parental immunity, I heartily assert that we should decline to extend the doctrine to stepparents. Declining to extend the doctrine to stepparents would not interfere with any discretion that a stepparent possesses. It would simply preclude them from establishing immunity for tortious conduct that results in injuries to their stepchild.
¶ 57 Furthermore, the majority is precisely rightI make reference to the above-mentioned obsolete forms of the parental immunity doctrine because it is evidence of the shrinking value of this antiquated doctrine of parental immunity. We should recognize the weak rationale underlying the doctrine and the trend here and in other jurisdictions to limit its application.
¶ 58 The second reason I have for concluding that we are ill advised to extend the doctrine to stepparents is that there is a substantial difference between the legal duties of a parent and those of a stepparent. It is, of course, universally recognized that parents have a statutory and common law duty to support and maintain their minor children. See RCW 26.16.205; see also State v. Wood, 89 Wash.2d 97, 569 P.2d 1148 (1977) (parent's obligation for care and support of child is a basic tenet recognized in Washington without reference to a particular statute). Furthermore, a parent's duty to pay support for a child generally continues until the child is emancipated. RCW 26.09.170(3). In contrast, this court has held that noncustodial parents do not have responsibility equal to that of the parents for the support of stepchildren. Harmon v. Dep't of Soc. & Health Servs., 134 Wash.2d 523, 542, 951 P.2d 770 (1998). For stepparents, unlike parents, the obligation to support a stepchild terminates as a matter of law on decree of dissolution, legal separation, or death. RCW 26.16.205; State ex rel. D.R.M. v. Wood, 109 Wash.App. 182, 34 P.3d 887 (2001). In extending parental immunity to stepparents, the majority provides them with the blanket protections afforded to a parent despite the absence of reciprocal obligations. In sum, the policy reasons underlying the parental immunity doctrine do not warrant extending the doctrine to stepparents.
¶ 59 For the aforementioned reasons, I dissent from the majority's determination to extend the parental immunity doctrine to stepparents who stand in loco parentis to a *510 stepchild. At the same time, I concur with the judgment of the majority that the trial court's summary judgment order should be reversed.
¶ 60 WE CONCUR: CHARLES W. JOHNSON and TOM CHAMBERS, JJ.
NOTES
[1] Following the commencement of this action, Ashley's mother changed her surname from "Zellmer" to "Ferguson." Resp't Joel Zellmer's Resp. to Court's Req. for Suppl. Briefing at 1. To avoid confusion, we address her as Stacey Ferguson.
[2] "Willful" requires a showing of actual intent to harm, while "wanton" infers such intent from reckless conduct. Adkisson v. City of Seattle, 42 Wash.2d 676, 684-85, 258 P.2d 461 (1953) (quoting RESTATEMENT OF TORTS (SECOND) § 500 (1965)).
[3] However, the legislature of one state has enacted a strict form of parental immunity. See La. Rev.Stat. Ann. 9:571 (barring suit by unemancipated child against custodial parent or legal custodian). In a few states, courts have declined to abrogate the judicially created parental immunity doctrine on the grounds such a change should come from the legislature. See Warren v. Warren, 336 Md. 618, 650 A.2d 252 (1994) (declining to abrogate parental immunity in the case of motor vehicle torts, while refusing to extend it to stepparents); Hurst v. Capitell, 539 So.2d 264 (Ala. 1989) (retaining parental immunity with limited exception in cases of sexual abuse); Richards v. Richards, 599 So.2d 135 (Fla.Dist.Ct.App.) (disallowing intentional tort claim by child), review dismissed, 604 So.2d 487 (Fla.1992).
[4] Most jurisdictions abrogated parental immunity in the case of motor vehicle torts, reasoning that mandatory automobile liability insurance renders it unnecessary to bar suit in order to preserve family finances or family harmony. See Warren, 336 Md. at 622 n. 1, 650 A.2d 252 (noting only eight states continue to apply the parental immunity doctrine in cases of motor vehicle torts).
[5] The concurrence/dissents refers to the parental immunity doctrine's "weak rationale" to explain its unwillingness to extend protection to stepparents. Concurrence/dissent at 509. The modern parental immunity doctrine is solidly rooted in the public policy to protect the exercise of parental discretion. Moreover, as discussed above, there has been a remarkable convergence of opinion that allowing negligent parental supervision claims is bad public policy, even among those jurisdictions that either abolished the parental immunity doctrine or declined to adopt it in the first instance. The concurrence/dissent addresses an obsolete form of the parental immunity doctrine.
[1] In reaching that long ago decision in the Roller case, our court appeared to have been influenced by what we said was the general common law rule prohibiting a minor from suing a parent for damages arising in tort. At that time there was no common law rule in Washington inhibiting a stepchild from suing a stepparent for tortious conduct and none has, as noted, been adopted prior to this time.
[2] Judicial support for the general concept of immunity from tort liability has been waning in this state for some time. In that regard, this court has consigned two common law immunity doctrines to the legal dustbin, notably interspousal immunity in Freehe v. Freehe, 81 Wash.2d 183, 500 P.2d 771 (1972), overruled in part on other grounds by Brown v. Brown, 100 Wash.2d 729, 675 P.2d 1207 (1984) and charitable immunity in Friend v. Cove Methodist Church, Inc., 65 Wash.2d 174, 396 P.2d 546 (1964). Governmental immunity, which existed in this state for many years by statute, was rendered extinct in the 1960s by the legislature's adoption of RCW 4.92.090 and RCW 4.96.010.
[3] See Rousey v. Rousey, 528 A.2d 416 (D.C.1987); Petersen v. City & County of Honolulu, 51 Haw. 484, 462 P.2d 1007 (1969); Rupert v. Stienne, 90 Nev. 397, 528 P.2d 1013 (1974); Nuelle v. Wells, 154 N.W.2d 364 (N.D.1967); Elkington v. Foust, 618 P.2d 37 (Utah 1980); Wood v. Wood, 135 Vt. 119, 370 A.2d 191 (1977).
[4] See Broadbent v. Broadbent, 184 Ariz. 74, 907 P.2d 43 (1995); Gibson v. Gibson, 3 Cal.3d 914, 92 Cal.Rptr. 288, 479 P.2d 648 (1971); Anderson v. Stream, 295 N.W.2d 595 (Minn. 1980); Hartman v. Hartman, 821 S.W.2d 852 (Mo.1991); Briere v. Briere, 107 N.H. 432, 224 A.2d 588 (1966); Guess v. Gulf Ins. Co., 96 N.M. 27, 627 P.2d 869 (1981); Gelbman v. Gelbman, 23 N.Y.2d 434, 245 N.E.2d 192, 297 N.Y.S.2d 529 (1969); Shearer v. Shearer, 18 Ohio St.3d 94, 480 N.E.2d 388 (1985); Winn v. Gilroy, 296 Or. 718, 681 P.2d 776 (1984); Falco v. Pados, 444 Pa. 372, 376, 282 A.2d 351 (1971); Elam v. Elam, 275 S.C. 132, 268 S.E.2d 109 (1980).
[5] See Hebel v. Hebel, 435 P.2d 8 (Alaska 1967); Streenz v. Streenz, 106 Ariz. 86, 471 P.2d 282 (1970); Williams v. Williams, 369 A.2d 669 (Del. 1976); Ard v. Ard, 414 So.2d 1066 (Fla.1982); Nocktonick v. Nocktonick, 227 Kan. 758, 611 P.2d 135 (1980); Sorensen v. Sorensen, 369 Mass. 350, 339 N.E.2d 907 (1975); Transamerica Ins. Co. v. Royle, 202 Mont. 173, 656 P.2d 820 (1983); Unah v. Martin, 676 P.2d 1366 (Okla.1984); Silva v. Silva, 446 A.2d 1013 (R.I.1982); Smith v. Kauffman, 212 Va. 181, 183 S.E.2d 190 (1971); Lee v. Comer, 159 W.Va. 585, 224 S.E.2d 721 (1976).
[6] See Burdick v. Nawrocki, 21 Conn.Supp. 272, 274, 154 A.2d 242 (1959); C.M.L. v. Republic Servs., Inc., 800 N.E.2d 200, 209 (Ind.Ct.App. 2003); Warren v. Warren, 336 Md. 618, 628, 650 A.2d 252 (1994); Rayburn v. Moore, 241 So.2d 675, 676 (Miss 1970).